- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
               )
UNITED STATES OF AMERICA,    )
               )
  v.             )
               )  Case No.: 1:22-CR-00369-TSC
VLADISLAV OSIPOV,      )
               )
       Defendant.   )
               )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## **MEMORANDUM IN SUPPORT OF VLADISLAV OSIPOV'S**
## <u>**MOTION TO DISMISS THE INDICTMENT**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION.................................................................................................................... 1

I.     Factual allegations in the Indictment ................................................................... 4

II.    The fugitive disentitlement doctrine does not bar consideration of Mr. Osipov's
motion.................................................................................................................... 6

III.   The Indictment should be dismissed. ................................................................. 9

   A.    Legal standard for a motion to dismiss .......................................................... 9

   B.    The Indictment fails to state an offense under the correct reading of the law. ...... 10

   C.    The Rule of Lenity requires ambiguity to be resolved in favor of Mr. Osipov. ..... 16

   D.    Applying the sanctions regime to reach the conduct alleged in the Indictment
would be an unconstitutional application of the statute.......................................... 16

CONCLUSION ...................................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

\*_Bittner v. United States_,
  589 U.S. __, 143 S. Ct. 713 (2023).................................................................. 1, 13, 18, 19

\*_Changji Esquel Textile Co. v. Raimondo_,
  40 F.4th 716 (D.C. Cir. 2022) ........................................................................... 14

\*_Karem v. Trump_,
  960 F.3d 656 (D.C. Cir. 2020) ........................................................................... 18

\*_Nell v. Wormuth_,
  No. 21-CV-3248 (APM), 2022 WL 2702334 (D.D.C. July 12, 2022) .................................... 13

\*_RadLAX Gateway Hotel, LLC v. Amalgamated Bank_,
  566 U.S. 639 (2012)......................................................................................... 14, 15

\*_United States v. Bescond_,
  24 F.4th 759 (2d Cir. 2022) ............................................................................... 7, 8, 9

\*_United States v. Cornelson_,
  595 F. Supp. 3d 265 (S.D.N.Y. 2022) .................................................................. 6, 7, 9

\*_United States v. Panayiotou_,
  No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023)............................................ 13

_Bellion Spirits, LLC v. United States_,
  7 F.4th 1201 (D.C. Cir. 2021) ............................................................................. 19

_Clark v. Martinez_,
  543 U.S. 371 (2005 ........................................................................................... 19, 20

_Commissioner v. Acker_,
  361 U.S. 87 (1959)............................................................................................ 1

_F.C.C. v. Fox Television Stations, Inc._,
  567 U.S. 239 (2012)........................................................................................... 18

_HCSC–Laundry v. United States_,
  450 U.S. 1 (1981)............................................................................................. 14

_Hibbs v. Winn_,
  542 U.S. 88 (2004)............................................................................................ 16

iii

*McBoyle v. United States*,
  283 U.S. 25 (1931).................................................................................................. 1

*Patten v. District of Columbia*,
  9 F.4th 921 (D.C. Cir. 2021),
  *cert. denied*, 142 S. Ct. 1129 (2022) ..................................................................... 14

*Streep v. United States*,
  160 U.S. 128 (1895)............................................................................................... 8

*Trump v. Thompson*,
  573 F. Supp. 3d 1 (D.D.C.), *aff'd*, 20 F.4th 10 (D.C. Cir. 2021),
  *cert. denied*, 142 S. Ct. 1350 (2022) ..................................................................... 20

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001)................................................................................................ 16

*United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct.*, *No.*
  *2029-56141070, Held in Name of Soulbury Ltd.*,
  554 F.3d 123 (D.C. Cir. 2009)........................................................................... 7, 8

*United States v. Any & all Funds on Deposit in Acct. No. XXXXX-XXXXXXXX at HSBC Bank*
  *PLC, 55 Corp. St., Coventry, United Kingdom*,
  87 F. Supp. 3d 163 (D.D.C. 2015)......................................................................... 8

*United States v. Ballestas*,
  795 F.3d 138 (D.C. Cir. 2015)............................................................................... 5

*United States v. Banki*,
  685 F.3d 99 (2d Cir. 2012) .................................................................................. 18

*United States v. Davis*,
  588 U.S. ___, 139 S. Ct. 2319 (2019)................................................................... 16

*United States v. Grider*,
  617 F. Supp.3d 42 (D.D.C. 2022) .................................................................. 10, 11

*United States v. Naik*,
  No. 19-CR-373 (TSC), 2020 WL 534539 (D.D.C. Feb. 2, 2020) ........................... 11

*United States v. Percoco*,
  __U.S. __ (Slip. Op. May 11, 2023).................................................................... 16

*United States v. Sheppard*,
  No. 21-CR-203 (JDB), 2022 WL 17978837 (D.D.C. Dec. 28, 2022) ..................... 20

*Whitman v. American Trucking Ass'ns Inc.*,
  531 U.S. 457 (2001).............................................................................................. 15

*Wooden v. United States*,
  __ U.S. __ 142 S. Ct. 1063 (2022) ......................................................................... 18

**Statutes**

31 C.F.R. § 589 ........................................................................................................ 10

31 C.F.R. § 589.300-343 .......................................................................................... 10

31 CFR § 589.201 ................................................................................. 2, 13, 14, 15, 17

31 CFR § 589.411 ........................................................... 2, 3, 10, 11, 12, 13, 14, 15, 17

50 U.S.C. § 1705 ....................................................................................................... 2

**Rules**

Fed. R. Crim. P. 12 .......................................................................................... 9, 16, 18

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ......................................................... 7

## INTRODUCTION

"[P]enal statutes are to be construed strictly, and an individual is not to be subjected to a penalty unless the words of the statute plainly impose it." *Bittner v. United States*, 589 U.S. __, __, 143 S. Ct. 713, 724 (2023) (internal quotation marks omitted) (quoting *Commissioner v. Acker*, 361 U.S. 87, 91 (1959)). These are not empty words. Due process promises that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Bittner*, 143 S. Ct. at 724 (citing *McBoyle v. United States*, 283 U.S. 25, 27 (1931)). Mr. Osipov is a Swiss citizen. He is a former citizen of the Russian Federation. Mr. Osipov left Russia in February 2000 and has lived outside of Russia ever since. For the past sixteen years, he has lived in Switzerland with his wife, a Swiss citizen, and their 15-year-old daughter. Mr. Osipov owns and operates a small advisory business in Zurich with three employees, including himself, providing project management services to several clients. The Indictment charges Mr. Osipov with having committed felony offenses under United States law. The charges are not based on a plain reading of United States sanctions law, but rather on an expansive and unbounded interpretation of that law, an interpretation that would make unlawful conduct that violates neither the clear and specific provisions of that law nor the guidance published by the United States Department of Treasury Office of Foreign Assets Control (OFAC), the agency responsible for enforcing that law. The extraordinary interpretation of the law on which the Indictment is premised is simply a misreading of the sanctions law. Indeed, such an interpretation would deny Mr. Osipov due process. Accordingly, the Indictment against him should be dismissed, either because the reading of the law on which the Indictment is based is incorrect and the Indictment, therefore, fails to state an offense or, alternatively, because if that reading were to be accepted, the law would be unconstitutional as applied to Mr. Osipov.

The United States sanctions regime applies to U.S. persons. It also applies to non-U.S. persons, like Mr. Osipov, if the conduct has a sufficient nexus to the United States.[1]

Under the International Emergency Economic Powers Act (IEEPA) 50 U.S.C. § 1705(c), it is a felony to knowingly and willfully violate the sanctions regime. Through Executive Orders, and regulations promulgated to implement the Executive Orders, the government names certain individuals and entities whose property and interests in property are "blocked" or subject to sanctions (Specially Designated Nationals and Blocked Persons). These individuals are referred to as SDNs, or individuals or entities that are "blocked" or sanctioned.

Various Executive Orders relating to these Russia-Ukraine sanctions broadly proscribe engaging in transactions with blocked individuals and entities and "the making of any contribution or provision of funds, goods, or services by, to, or *for the benefit of* any person whose property and interests in property are blocked pursuant to paragraph (a) of this section; . . ." Executive Order 13662 (emphasis added). While the implementing regulation repeats the "for the benefit of" language, 31 CFR § 589.201(b)(1), neither the Executive Orders nor the implementing regulation define this broad and vague phrase. The implementing regulation, however, has a provision specifically stating the circumstances under which transactions with unblocked entities are impermissible. 31 CFR § 589.411. That provision prohibits engaging in transactions with an entity that is not blocked if the entity is 50% or more owned by a sanctioned individual. *Id.*

The Indictment does not allege that Mr. Osipov made or caused any contribution or provision of funds, goods, or services to an entity or individual whose property or interests in

---

[1] For purposes of this motion, Mr. Osipov is not contesting that his involvement in the transactions at issue in the Indictment had a sufficient nexus to the United States to be subject to United States law. Rather, as the motion explains, even assuming such a nexus, the Indictment fails to allege that Mr. Osipov engaged in transactions prohibited under the sanctions regime and, therefore, the Indictment fails to state a violation of that regime, much less a knowing and willful violation.

property were blocked. Nor does it allege he engaged in or caused any transaction with an entity owned 50% or more, directly or indirectly, by a sanctioned person.  Instead, the Indictment ignores the 50% rule and claims as violations transactions that fully complied with that rule, charging violations based on transactions with an unblocked entity not alleged to be more that 50% owned (or owned at all) by a sanctioned individual. Thus, the entire Indictment is dependent on a reading of the sanctions regime that transactions with unblocked entities in compliance with the 50% rule can nonetheless constitute a violation by somehow running afoul of the vague and undefined "for the benefit" language.

Count One of the Indictment alleges a conspiracy to violate IEEPA. Counts Two through Eight allege substantive violations of IEEPA, and Counts Nine through Fourteen allege money laundering premised on the substantive violations of IEEPA as the alleged specified unlawful activity. Yet, the Indictment does *not* allege that Mr. Osipov engaged in, or caused another to engage in, any transaction with an entity or individual designated as subject to sanctions; nor does it allege that he engaged in, or caused another to engage in, any transaction with an entity owned 50% or more, directly or indirectly, by an individual subject to sanctions. Instead, the Indictment is premised entirely on the allegation that Mr. Osipov engaged in, or caused, transactions "for the benefit" of a sanctioned individual because he did business with an entity that was *not* blocked <u>and</u> was *not* owned 50% or more, directly or indirectly, by a sanctioned individual.

An entity less than 50% owned by a sanctioned individual is not subject to sanctions, meaning that individuals and companies are not prohibited from doing business with such an entity. 31 CFR § 589.411; OFAC FAQs 398. This is true even if the entity that is less than 50% owned by a sanctioned individual is controlled by the sanctioned individual.

In this regard, OFAC has provided the following specific guidance:

> **Question**: Does OFAC consider entities over which one or more blocked persons exercise control, but of which they do not own 50 percent or more in the aggregate, to be blocked pursuant to OFAC's 50 Percent Rule?
>
> **Answer**: No. OFAC's 50 Percent Rule speaks only to ownership and not to control. An entity that is controlled (but not owned 50 percent or more) by one or more blocked persons is not considered automatically blocked pursuant to OFAC's 50 Percent Rule. . . .

OFAC Frequently Asked Questions 398.

Where a sanctioned individual controls an entity in which he or she has a substantial ownership stake, plainly, the sanctioned individual may benefit from transactions with that entity. Nonetheless, the drafters decided to allow transactions with entities owned less than 50% by a sanctioned person, even if controlled by a sanctioned person. Presumably, they reasonably determined that such transactions were not sufficiently "for the benefit" of the sanctioned person that they should be prohibited. Accordingly, the premise of the Indictment that a transaction violates the sanctions regime when it is with an entity that is not sanctioned and that is not owned 50% or more by a sanctioned individual, constitutes an incorrect interpretation of the law. At a minimum, Mr. Osipov was not on notice that the law would extend to the transactions at issue in the Indictment. The Indictment therefore fails to state an offense or it violates due process. Either way, it must be dismissed.

## I. Factual allegations in the Indictment[2]

The Indictment alleges that Mr. Osipov, through his Swiss business, engaged in transactions with an entity that owned a yacht and caused goods and services to be acquired for

---

[2] While Mr. Osipov disagrees with many of the allegations in the Indictment, he is not challenging those allegations for the purpose of this Motion. *See United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015) (when ruling on a motion to dismiss an indictment, the district court assumes the truth of the factual allegations in the indictment and the government's proffered facts).

the yacht. Some of these goods or services were provided by companies based in the United States, and some of the goods and services that were acquired for the yacht involved payments processed by United States financial institutions. The total amount of the goods and services in question amounted to approximately $270,000. Indictment ¶¶ 36(p)-(s), 43, 45.[3]

The Indictment alleges that an individual referred to as SD 1 is a blocked individual under the Russia-Ukraine sanctions regime. The Indictment does not allege, however, that the entity that owned the yacht was a blocked entity. And the Indictment acknowledges that the entity that owned the yacht was *not* owned by SD 1 or any other sanctioned person. *Id.* ¶ 23. The Indictment is instead premised on the allegation that SD 1 benefited from the goods and services acquired for the yacht. *Id.* ¶ 8, 34. Specifically, the Indictment alleges that these transactions violated the United States sanctions regime because SD 1 is the yacht's "ultimate beneficial owner." *Id.* at ¶ 2. The Indictment, however, does *not* allege that the yacht was 50% or more owned, directly or indirectly, by SD 1. Indictment ¶¶ 23, 26. Instead, it alleges that the yacht was owned by an entity of which there were two shareholders. One of the shareholders was a subsidiary of a foundation. The Indictment does not allege that SD 1, directly or indirectly, had *any* ownership interest in the foundation, but merely that a beneficiary of the foundation was a company owned by SD 1. The other alleged shareholder of the entity that allegedly owned the yacht was an entity allegedly

---

[3] The total transaction amounts are calculated from the specific transactions enumerated in paragraphs 36(p)-(s), 43, and 45 of the Indictment (adjusting the total amounts accordingly when the same transaction has been listed in multiple paragraphs). The Indictment identifies transactions in euros, pounds, and dollars, and therefore the exact United States dollar amounts will depend on the exchange rate received on the dates of those various transactions. The Indictment also appears to contain a typo in a transaction identified for Count 3 in paragraph 43, but for purposes of this motion, Mr. Osipov has construed that amount in favor of the government. The Indictment also refers to payment for the boat's registration fees. The exact amounts of the registration fees are unknown because they were comingled with the registration fees paid for other vessels, but they were less than $39,000. Indictment ¶ 36(z).

owned by an employee of SD 1. There is no allegation that SD 1 had *any* ownership interest at all in this entity. *Id.* at 23.[4]

## II.  The fugitive disentitlement doctrine does not bar consideration of Mr. Osipov's motion.

Mr. Osipov is a foreign national who resides and operates his business abroad. He has never been a United States citizen, nor has he ever resided in the United States. He also was not in the United States when the Indictment was returned.[5]

While the fugitive disentitlement doctrine has at times been invoked by courts as a reason to decline to consider a motion filed by a defendant who is a fugitive, Mr. Osipov is not a fugitive. The fugitive disentitlement doctrine therefore does not bar the Court's consideration of Mr. Osipov's motion. Indeed, consideration of this motion on the merits would be in accordance with recent precedent from the Second Circuit and consistent with prior precedent from this Circuit.

The fugitive disentitlement doctrine was first developed as a way for courts to dismiss appeals in criminal cases by defendants who had escaped custody after filing the appeal and were evading the court's jurisdiction. *See United States v. $6,976,934.65, Plus Int. Deposited into Royal*

_____

[4] The Indictment alleges that the entity that owned the yacht ("Owner-Entity") was jointly owned by two foreign entities, identified in the Indictment as Entity 1 and Entity 4. *Id.* ¶ 23. Entity 1 is a Panamanian corporation owned by a Panamanian foundation ("Foundation/Entity 2"). *Id.* at 23(a). The beneficiary of the Foundation/Entity 2 is Entity 3, which is alleged to be owned by SD 1. *Id.* Entity 4, co-owner of Owner-Entity, is owned by Entity 5. Entity 5 is, according to the Indictment, "allegedly" owned by an individual who is said to be an employee of SD 1. *Id.* at 23(b). Mr. Osipov is alleged to have been an attorney-in-fact and an authorized signatory for the Owner-Entity. *Id.*

[5] In considering application of the doctrine, courts may consider facts external to the indictment. *See, e.g., United States v. Cornelson*, 595 F. Supp. 3d 265, 269-70 (S.D.N.Y. 2022). Attached as Exhibit 1 is a Declaration from Mr. Osipov demonstrating that he has resided in Switzerland continuously for the past sixteen years, is not a United States citizen, and was in Switzerland at the time that the Indictment was returned. Pursuant to the Article 25 "protection against expulsion, extradition and deportation" of the Federal Constitution of the Swiss Confederation of April 1999 (Status as of 13 February 2022) (https://www.fedlex.admin.ch/eli/cc/1999/404/en#art_25), Switzerland does not extradite its citizens, and the United States has not sought his extradition.

*Bank of Scotland Int'l, Acct., No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 127 (D.C. Cir. 2009). The Second Circuit recently reviewed the doctrine and held that it did not apply in the context of a foreign national's motion to dismiss a criminal indictment. *See United States v. Bescond*, 24 F.4th 759 (2d Cir. 2022).

The application of the doctrine requires a two-step analysis, and only if both criteria are met may the court, in its discretion, disentitle the fugitive from being heard. *See Cornelson*, 595 F.Supp.3d at 270. Because the doctrine only applies to fugitives, the first step in this analysis requires a determination of whether the litigant is, in fact, a fugitive. *Bescond*, 24 F.4th at 771 ("in order to disentitle a litigant, a court must first determine if that the litigant is a fugitive"). "A fugitive is someone who flees or escapes; a refugee, or a criminal suspect or a witness in a criminal case who flees, evades, or escapes arrest, prosecution, imprisonment, service of process, or the giving of testimony, especially by fleeing the jurisdiction or by hiding." *Id.* (internal quotations and punctuation omitted) citing BLACK'S LAW DICTIONARY (11th ed. 2019). The Supreme Court defines a fugitive as one who "has left its jurisdiction and is found within the territory of another." *Streep v. United States*, 160 U.S. 128, 134 (1895). The Second Circuit in *Bescond* held that someone like Mr. Osipov, who simply remains in his own country and whose presence abroad is unrelated to the American prosecution, does not meet the definition of a "fugitive." *See Bescond*, 24 F.4th at 772. Because Mr. Osipov did not commit any allegedly criminal conduct while in the United States, did not flee from the United States, and has not concealed himself, he is not a fugitive under *Bescond*.

*Bescond*'s reasoning is consistent with precedent from the D.C. Circuit. In *United States v. $6,976,934.65, Plus Int. Deposited into Royal Bank of Scotland Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 132 (D.C. Cir. 2009), the court found the doctrine

did not necessarily apply to an individual living and conducting his business abroad because "mere notice or knowledge of an outstanding warrant, coupled with a refusal to enter the United States, does not satisfy the statute. The alleged fugitive must have 'declined to enter or reenter' the country in order to avoid prosecution." This Court reached the same result with respect to a Thai native who did not live in the United States and was outside the country when the indictment was returned. *See United States v. Any & all Funds on Deposit in Acct. No. XXXXX-XXXXXXXX at HSBC Bank PLC, 55 Corp. St., Coventry, United Kingdom,* 87 F. Supp. 3d 163, 168 (D.D.C. 2015) (Cooper, J.).

The second step in the analysis is to determine whether disentitling the defendant would serve the doctrine's objectives. *See Cornelson*, 595 F. Supp. 3d at 272. These purposes are: (1) assuring the enforceability of any decision that may be rendered against the fugitive; (2) imposing a penalty for flouting the judicial process; (3) discouraging flights from justice and promoting the efficient operation of the courts; and (4) avoiding prejudice to the other side caused by the defendant's escape. *Id.* Three of these four objectives (the second, third, and fourth) clearly would not be served by applying the doctrine to Mr. Osipov. *See id,* at 272-73 (second prerequisite not satisfied where the defendant, like Mr. Osipov, was a foreign national living abroad who was not in the United States at the time of the indictment or alleged crimes, there was no allegation he was part of a criminal organization whose members might be encouraged to flee the United States, and there was no need for the government to gather new evidence related to his period of absence).

The first objective, ensuring enforceability, also is not furthered by delaying a decision on Mr. Osipov's motion to dismiss. "Courts have used this factor to analyze whether disentitlement is an appropriate means of ensuring mutuality in the litigation." *Id.* at 272. "The paradigmatic case in which mutuality is absent is where the defendant flees to 'seize an unfair advantage' or to 'game

the system.'" *Id.* (citing *Bescond*, 24 F.4th at 774). Mr. Osipov has not fled and would obtain no unfair advantage as a result of the Court resolving his motion on the merits. Further, a ruling on the merits against Mr. Osipov would merely maintain the status quo, whereas a ruling in his favor would serve the efficient operation of the courts by resolving the case in an appropriate and timely manner rather than allowing a defective indictment to remain pending indefinitely.

Since neither prerequisite for its application is present in this case, the fugitive disentitlement doctrine does not apply. Alternatively, even if this Court had the discretion to invoke the doctrine, it should not do so for all the reasons stated above. Mr. Osipov's motion to dismiss should be resolved on its merits.

### III.   The Indictment should be dismissed.

#### A.      Legal standard for a motion to dismiss.

Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). The sufficiency of an indictment, its failure to state a claim, and the interpretation of a federal statute are matters of law and are proper bases for a motion to dismiss an indictment. Fed. R. Crim. P. 12(b)(3)(B); *see also United States v. Grider*, 617 F. Supp.3d 42, 48 (D.D.C. 2022) (Kollar-Kotelly, J.).

Likewise, a motion to dismiss is a proper vehicle for raising an as-applied constitutional challenge:

> A defendant may challenge a defect in the indictment or information—including its constitutionality—as long as the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits. A defendant may challenge a statute as unconstitutional on its face or as applied to the conduct alleged. In order to show that a statute is facially unconstitutional, a defendant must demonstrate that the statute is unconstitutional in all of its applications. In contrast, an as-applied challenge need only show that the statute is an unconstitutional exercise of congressional power as applied to the defendant.

*United States v. Naik*, No. 19-CR-373 (TSC), 2020 WL 534539, at *2 (D.D.C. Feb. 2, 2020) (internal citations and quotation marks omitted). "As-applied" challenges may be decided at the motion to dismiss phase so long as the allegations can be determined from the face of the indictment. *See, e.g., id.*; *see also Grider*, 617 F. Supp. 3d at 49.

  **B.  The Indictment fails to state an offense under the correct reading of the law.**

  The United States' economic sanctions against Russia arise from several executive orders and statutes and are implemented by 31 C.F.R. § 589. Subsection 201(b)(1) of that regulation generally proscribes "making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to paragraph(a) of this section;" The regulation's general definitions (31 C.F.R. § 589.300-343), however, fail to define the phrase "for the benefit of."

  In the context of determining whether a transaction for the benefit of an entity is prohibited because of the entity's association with a sanctioned individual, however, 31 CFR § 589.411 provides a clear definition. The sanctioned individual must not own, directly or indirectly, a 50% or greater interest in the entity:

> (a) Persons whose property and interests in property are blocked pursuant to § 589.201 have an interest in all property and interests in property of an entity in which such persons directly or indirectly own, whether individually or in the aggregate, a 50 percent or greater interest. The property and interests in property of such an entity, therefore, are blocked, and such an entity is a person whose property and interests in property are blocked pursuant to § 589.201, regardless of whether the name of the entity is incorporated into OFAC's Specially Designated Nationals and Blocked Persons List (SDN List).

> (b) Persons subject to § 589.202, § 589.203, § 589.204, or § 589.205 have an interest in all property and interests in property of an entity in which such persons directly or indirectly own, whether individually or in the aggregate, a 50 percent or greater interest. The property and interests in property of such an entity, therefore, are also subject to § 589.202, § 589.203, § 589.204, or § 589.205, regardless of

whether the name of the entity is incorporated into OFAC's Sectoral Sanctions Identifications List.

31 CFR § 589.411.

To help navigate this regulatory regime, OFAC publishes guidance in the form of Frequently Asked Questions. Under the Russia-Ukraine sanctions regime, FAQs 398-402 offer guidance on permissible transactions with entities. (OFAC FAQs are available at: https://ofac.treasury.gov/faqs/topic/1521.)

FAQ 398 specifically states that ownership, rather than control, over the entity is the question that determines what transactions are impermissible. OFAC urges caution when doing "a transaction with an entity that is not a blocked person (a non-blocked entity) in which one or more blocked persons have a significant ownership interest that is less than 50 percent, or which one or more blocked persons may control by means other than a majority ownership interest," not because such transactions violate the sanctions regime, but rather because "such non-blocked entities may become the subject of future designations . . . ." Thus, unless and until future designations are made, such transactions are not proscribed by the regulation.

The remaining FAQs deal with aggregating ownership interests, negotiations with individuals, complex structures, and divesture. None proscribe transactions with entities associated with an SDN, as long as the entity is not owned 50% or more, directly or indirectly, by the SDN and the SDN does not directly participate in the entity's negotiations or business dealings.

When the government has issued guidance to the public at odds with the interpretation it seeks in a criminal indictment, it "counts as one more reason yet to question whether its current position represents the best view of the law." *Bittner*, 143 S. Ct. at 722 (courts may consider the

consistency of an agency's views when weighing the persuasiveness of any interpretation the government proffers in court).[6]

Further, laws should be interpreted to render a coherent and consistent scheme rather than interpreted to create conflict and ambiguity. *See, e.g., United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953, at *8 (D.D.C. Jan. 25, 2023) (rejecting the government's reading of a provision because it would create irreconcilable conflict with other provisions of the statute); *see also Nell v. Wormuth*, No. 21-CV-3248 (APM), 2022 WL 2702334, at *4 (D.D.C. July 12, 2022) (interpreting a statute to eliminate the contradiction between provisions). While offering no definition of the general phrase "for the benefit" of a sanctioned person, the lawmakers promulgating the regulatory scheme made it clear through § 589.411 that the law does not prohibit transactions with entities that are not themselves blocked, if they are not 50% or more owned by sanctioned person. This is true even if a sanctioned person controls that entity. The logical import of this approach is that transactions with entities that are neither blocked nor majority owned by an individual who is blocked are not, in the lawmaker's determination, sufficiently "for the benefit" of the sanctioned person to be prohibited.

---

[6] The United States' regulation is different from the regulation in United Kingdom, which considers both ownership and control, and sanctions entities that fall under the UK's articulated test for control by a sanction individual.
*See* Office of Financial Sanctions Implementation (OFSI) guidance available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file /1144893/General_Guidance_-_UK_Financial_Sanctions__Aug_2022_.pdf. Had OFAC wanted to adopt a regime that considered control or beneficiary status rather than ownership, similar to the sanctions regime in the UK, it could have done so and is free to do so going forward. But it cannot criminally prosecute someone for engaging in transactions with an entity based on the alleged control of that entity by an SDN under the existing regime. The existing regime, as OFAC's own guidance recognizes, proscribes transactions with entities based solely on the ownership of the entity.

The well-established canon of statutory interpretation that "the specific governs the general" reinforces this conclusion. Under this canon of interpretation, the specific language must govern broad general language, to the extent of any conflict between the two. *See Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 724 (D.C. Cir. 2022). It is most frequently applied in regulatory schemes such as this one, where "a general permission or prohibition is contradicted by a specific prohibition or permission." *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). It is particularly applicable where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Patten v. District of Columbia*, 9 F.4th 921, 926 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1129 (2022); *see also HCSC–Laundry v. United States,* 450 U.S. 1, 6 (1981) (per curiam) (the specific governs the general "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]").

Section 589.411 is a specific, detailed provision that spells out when doing transactions with unblocked entities is prohibited, whereas § 589.201(b)(1), the provision containing the "for the benefit" verbiage, is a broadly worded prohibition that does not specifically address transactions with unblocked entities. The "specific controls the general" canon explains that general language should not be construed so broadly as to repudiate or conflict with more specific provisions that address and govern the type of conduct in question. *See RadLAX Gateway Hotel,* 566 U.S. at 646.

In order to save the Indictment, the Court would need to interpret the regulation such that § 589.201(b)(1)'s general and undefined prohibition on transactions "for the benefit of" a sanctioned individual silently prohibits transactions with unblocked entities that are not more than 50% owned by a sanctioned individual, even though § 589.411 explicitly states that such

transactions are not prohibited, even if the entity is controlled by a sanctioned individual. *See Whitman v. American Trucking Ass'ns Inc.*, 531 U.S. 457, 468 (2001) (Lawmakers do "not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not . . . hide elephants in mouseholes.") Such a reading would render § 589.411 superfluous. If § 589.201(b)(1) were to be read to prohibit all transactions for the benefit of a blocked individual, including transactions with unblocked entities having any relationship with a blocked individual, there would be no need for § 589.411 prohibiting transactions with unblocked entities that are more than 50% owned by a blocked individual. All transactions prohibited under § 589.411 would already be impermissible under § 589.201(b)(1). It is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant. . . .").[7]

---

[7] This construction would not only render § 589.411 superfluous, but it would also introduce additional problems. If the 50% rule is superfluous, there is *no* definition of when a blocked individual would be deemed to benefit, regardless of how attenuated that benefit might be, from a transaction with an unblocked entity. A statute is constitutional infirm if fails to put people on fair notice of what it prohibits by ambiguity or vagueness. *See United States v. Davis*, 588 U.S. ___, 139 S. Ct. 2319, 2323 (2019) ("Only the people's elected representatives in Congress have the power to write new federal criminal laws. And when Congress exercises that power, it has to write statutes that give ordinary people fair warning about what the law demands of them. Vague laws transgress both of those constitutional requirements. They hand off the legislature's responsibility for defining criminal behavior to unelected prosecutors and judges, and they leave people with no sure way to know what consequences will attach to their conduct."). "The Constitution's promise of due process does not tolerate that kind of uncertainty in our laws—especially when criminal sanctions loom." *United States v. Percoco*, __U.S. __ (Slip. Op. May 11, 2023) (Gorsuch, J concurring). Here, there is no allegation that a blocked individual had *any* ownership interest, direct or indirect, in the entity with which Mr. Osipov was doing business. As discussed below, Mr. Osipov was not on fair notice when engaging in transactions with an unblocked entity not

There is no reason for the Court to reach such a result when common sense and the traditional canons of statutory interpretation dictate against doing so. Indeed, the two provisions are easily reconcilable in accordance with the above principles and precedents. Section 589.201(b)(1) prohibits transactions "for the benefit of" a sanctioned individual but leaves this phrase vague and undefined. Section § 589.411, on the other hand, specifies with particularity that it is impermissible to engage in a transaction with an entity owned 50% or more by a sanctioned individual and that it is permissible to engage in a transaction with an entity that is not owned 50% or more by such an individual, regardless of whether such an individual controls the entity. Reading the two provisions together, engaging in a transaction with an entity that is 50% or more owned by a sanctioned individual is engaging in a transaction that is for the benefit of that individual and therefore violates § 589.201(b)(1) and the executive orders. Conversely, engaging in a transaction with an entity that is not owned 50% or more by a sanctioned individual has been determined by the lawmakers to be not sufficiently for the benefit of the sanctioned individual, pursuant to § 589.411, and therefore is not impermissible under § 589.201(b)(1).

This reading of the regulatory scheme is also far more natural than the reading on which the Indictment is premised. The Indictment is premised on a reading of the statute under which the language "for the benefit of" as used in § 589.201(b)(1), while completely undefined, is intended to silently preclude engaging in a transaction with an unblocked entity that is specifically permissible under § 589.411. It also would render § 589.411 entirely superfluous since the transactions that are proscribed by § 589.411 would already be prohibited under § 589.201(b)(1).

---

owned even in part, by any sanctioned individual that such transactions would violate United States law.

The logical and natural reading, and therefore the correct reading, of the regulation as a whole is that a transaction with an unblocked entity is not considered to be for the benefit of a blocked individual, and therefore impermissible, unless the blocked individual, directly or indirectly, owns more than 50% of the unblocked entity. Accordingly, the Indictment does not allege a violation of the sanctions regime. The Court therefore should dismiss the Indictment pursuant to Rule 12(b)(3)(B)(v) for failure to state an offense.

### C.     The Rule of Lenity requires ambiguity to be resolved in favor of Mr. Osipov.

Alternatively, if the Court determines that the provisions cannot be reconciled by traditional tools of statutory interpretation and, therefore, the regulation is ambiguous with two plausible readings, the rule of lenity requires that the ambiguity be interpreted in favor of Mr. Osipov. *See Bittner*, 143 S. Ct. at 724 ("Under the rule of lenity, this Court has long held, statutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals."). The rule of lenity "vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain." *United States v. Banki*, 685 F.3d 99, 109 (2d Cir. 2012), as amended (Feb. 22, 2012). Lenity is a means for upholding the Constitution's commitments to due process and the separation of powers. *See Wooden v. United States*, __ U.S. __ 142 S. Ct. 1063, 1082 (2022) (Gorsuch, J, concurring). Thus, even if the reading of the regulation on which the Indictment is based were a plausible reading, the Indictment must nonetheless be dismissed for failure to state an offense.

### D.     Applying the sanctions regime to reach the conduct alleged in the Indictment would be an unconstitutional application of the statute.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *See Karem v. Trump*, 960 F.3d 656, 664 (D.C. Cir. 2020) (internal citations and quotation marks omitted) (citing *F.C.C. v. Fox*

*Television Stations, Inc.*, 567 U.S. 239 (2012)). The Fifth Amendment's due process clause promises that "a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Bittner v. United States*, 143 S. Ct. 713, 725 (2023) (explaining U.S. Const. Amend. 5). Fair notice requires that "a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1214 (D.C. Cir. 2021). The interpretation of the sanctions regime on which the Indictment is premised fails under this crucial test as well.

Section 589.411 directly addresses transactions with unblocked entities and does not prohibit the transactions the Indictment is seeking to punish. Nor does § 589.201(b)(1) explicitly preclude such transactions. Neither the regulation nor the government's official public guidance relating to it provide fair notice that engaging in a transaction with an entity that is not blocked and that is not owned 50% or more by a sanctioned individual would be punishable as a crime. In fact, to the contrary, these sources provide every indication that the conduct on which the Indictment is based (doing a transaction with an unblocked entity that was not owned, even in part, directly or indirectly, by a blocked individual) was entirely legal. Basing a prosecution on a reading of the law that makes such conduct criminal would therefore be an unconstitutional application of the law.

Courts should, if possible, read statutes to avoid constitutional concerns. *See Clark v. Martinez*, 543 U.S. 371, 380-81 (2005) (defining constitutional avoidance, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail . . . ."). As this Court has recognized, the principle of constitutional avoidance rests on the

presumption that lawmakers did not intend to enact legislation which raises serious constitutional concerns. *See id.* at 381; *see also Trump v. Thompson*, 573 F. Supp. 3d 1, 18–19 (D.D.C.) (Chutkan, J.), *aff'd*, 20 F.4th 10 (D.C. Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022) ("[T]he court adheres to the canon of constitutional avoidance . . . [e]very legislative act is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly established."). Thus, like the rule of lenity, the canon of constitutional avoidance also counsels against accepting the reading of the regulatory scheme on which the Indictment is premised.

If, however, the Court accepts the interpretation of the sanctions regime on which the Indictment is based, Mr. Osipov nevertheless was not on fair notice of that interpretation at the time of the alleged conduct, and the application of that regime to Mr. Osipov would therefore violate the Due Process Clause. It is well established that charges based on an unconstitutional application of the law must be dismissed. *See United States v. Sheppard*, No. 21-CR-203 (JDB), 2022 WL 17978837, at *2 (D.D.C. Dec. 28, 2022). Accordingly, for this further reason, the Indictment must be dismissed pursuant to Rule 12(b)(1).

## CONCLUSION

Any regulatory regime, but particularly one that can lead to the imposition of criminal penalties, should be given its most fair and natural reading and any ambiguity interpreted against the government. Under such a reading of the Russia-Ukraine sanctions regime, it is unlawful for U.S. citizens, and for non-U.S. persons if the conduct has sufficient nexus to the United States, to engage in transactions with a sanctioned individual or entity and it also is unlawful to engage in transactions with an unblocked entity that is more than 50% owned by a sanctioned individual, since such transactions would be deemed for the benefit of the sanctioned individual. Even assuming for purposes of this motion that each of the factual allegations in the Indictment is true, the Indictment does not allege that Mr. Osipov engaged in, or caused, a transaction with a

sanctioned individual or entity or with an entity that is more than 50% owned by a sanctioned individual. In fact, it does not allege that SD 1 or any other sanctioned individual had *any* ownership interest, direct or indirect, in any entity with which Mr. Osipov did business. Accordingly, the Indictment fails to state a conspiracy to violate IEEPA, a substantive IEEPA violation, or money laundering premised on an IEEPA violation. The Indictment must therefore be dismissed in its entirety for failure to state an offense.

To the extent the sanctions regime is ambiguous, such that it could be read to prohibit engaging in or causing a transaction with an entity that is not blocked and that is not more than 50% owned by a sanctioned individual, the rule of lenity dictates that it must not be given such an expansive reading. Avoiding constitutional infirmities further counsels against this reading of the law. Accordingly, even if the sanctions regime could in theory be read in the manner on which the Indictment is premised, it should not be, and the Indictment should be dismissed for failure to state an offense.

Finally, if the Court were to find that the law does extend to the conduct alleged in the Indictment, Mr. Osipov was not provided fair notice that the conduct he allegedly engaged in was illegal. Accordingly, the law cannot constitutionally be applied to him. For this additional reason, the Indictment must be dismissed.

Dated: July 7, 2023
    Washington D.C.

                                     */s/ Barry J. Pollack*
                                   Barry J. Pollack (DC Bar #434513)
                                   HARRIS ST. LAURENT & WECHSLER LLP
                                   1775 Pennsylvania Avenue, NW, Suite 650
                                   Washington, D.C. 20006
                                   (202) 617-5971
                                   bpollack@hs-law.com

                                   *Attorney for Vladislav Osipov*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July 2023, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

*/s/ Barry J. Pollack*
Barry J. Pollack

20