**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **22-cr-369 (TSC)** |
| | : | |
| **v.** | : | |
| | : | |
| **VLADISLAV OSIPOV,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby files its opposition to the defendant Vladislav Osipov's Motion to Dismiss the Superseding Indictment (the "Motion"). The Defendant's Motion reeks of bad faith—asking this Court to rule on the merits of his motion despite that he refuses to submit to the Court's jurisdiction and will not do so even if the Court denies his Motion. Such a "heads I win, tails you lose" maneuver, if successful, would throw open this Court's docket for all fugitive defendants to seek the same relief. Moreover, the Defendant's Motion grossly misapprehends the standard that this Court applies to such a pleading; the Court must only find that the Superseding Indictment states a claim on its face. Defendant instead asks this Court to peek behind the Superseding Indictment, review his defense and assume facts in his favor, and decide issues of fact that will be questions for the jury. There is no basis to dismiss any counts of the Superseding Indictment and the Motion should be denied.

## LEGAL BACKGROUND

The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States. Section 1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a).

In 2014, the President issued Executive Order 13660 declaring a national emergency with respect to Russia's actions in the Crimea region of Ukraine pursuant to his authority under IEEPA.[1] These Executive Orders and their implementing regulations prohibit "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to [the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations]," *i.e.*, a specially designated national ("SDN"). The Ukraine-Related Sanctions Regulations automatically block any property in which an SDN holds a 50% or greater legal ownership interest. *See* 31 C.F.R. 589.411. More broadly, the Ukraine-Related Executive Orders and the Ukraine-Related Sanctions Regulations prohibit transactions by U.S. persons or in the United States that involve transferring, paying, exporting, withdrawing, or otherwise dealing in the "property" or "interests in property" of an SDN. "An interest in property" means "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. § 589.304. An individual or entity must secure a license from OFAC before obtaining or providing U.S. funds,

---

[1] Executive Orders 13661 and 13662 expanded the scope of the national emergency declared in Executive Order 13660 (Executive Orders 13660, 13661, and 13662 collectively referred to herein as the "Ukraine-Related Executive Orders"). OFAC has issued regulations to implement the Ukraine-Related Executive Orders. *See* 31 C.F.R. § 589.101 et seq. (hereinafter the "Ukraine-Related Sanctions Regulations").

goods, or services for the benefit of an SDN or before dealing in any "interest in property" of an SDN. Failure to obtain a license is a violation of IEEPA. 50 U.S.C. § 1705(a).

## **FACTUAL BACKGROUND**

As alleged in the Superseding Indictment, the Motor Yacht Tango ("M/Y Tango") is a luxury superyacht that was beneficially owned and used by an individual, Sanctioned Person 1. M/Y Tango was exclusively used by Sanctioned Person 1 and his family from the date of its delivery until March 2022. Throughout that time period, Sanctioned Person 1 sailed on M/Y Tango with the benefit of goods and services provided by U.S. persons and companies, including in the form of the U.S.-manufactured robes he and his guests wore,[2] entertainment that he watched provided by U.S. cable providers, and virtual meetings he attended courtesy of U.S. software providers. In 2014, Sanctioned Person 1 procured a loan for the yacht from a financial institution, which listed Sanctioned Person 1 as the owner of the yacht. The defendant, Vladislav Osipov, served as Sanctioned Person 1's manager of M/Y Tango.

On April 6, 2018, the United States Department of the Treasury's ("Treasury Department") Office of Foreign Assets Control ("OFAC") designated Sanctioned Person 1 "for operating in the energy sector of the Russian Federation economy" under Executive Orders 13661 and 13662. Thus, Sanctioned Person 1's April 2018 designation meant that U.S. persons and entities could not export or attempt to export goods or services for Sanctioned Person 1's benefit without a license from OFAC. Along those same lines, the April 2018 designation prohibited individuals, including

---

[2] The Motion states: "The allegation of concealment is made despite the fact that purchases included bathrobes monogrammed with Tango's logo." Motion at 6. As the Superseding Indictment makes clear, the Defendant and his coconspirators allegedly sought to conceal from U.S. financial institutions processing payments related to M/Y Tango's operation the true identity of the yacht and its beneficial owner. Those financial institutions would have no way to know about the monogram on the robes when processing the underlying payment, the wire reference for which used the yacht's code name "Fanta." Superseding Indictment ¶ 56(t).

the Defendant, from causing U.S. persons and entities, including U.S. companies and financial institutions, to export or attempt to export goods or services from the United States to or for the benefit of Sanctioned Person 1, without a license from OFAC.

Nonetheless, after the April 2018 designation, M/Y Tango continued to operate with the benefit of U.S. goods and services. Specifically, M/Y Tango continued to use U.S. technology and internet services, weather forecasting services, computing systems, satellite television, luxury items for guests, fuel, and teleconferencing software. Additionally, the purchases of these items were generally made through U.S. financial institutions, which unknowingly processed U.S. dollar payments necessary to M/Y Tango's operation. Foreign goods and services also were purchased, when needed, in U.S. dollars, causing additional transactions with U.S. financial institutions, and therefore the provision of U.S. services, all for the benefit of M/Y Tango.

As alleged in the Superseding Indictment, following the designation of Sanctioned Person 1, in September 2019, the Defendant and others caused the ownership structure of M/Y Tango to change in an apparent attempt to avoid the impact of the designation. Prior to the designation, a British Virgin Islands-based corporation ("Co-Conspirator 1") was listed as the legal owning company of M/Y Tango on legal filings, and that corporation was itself owned by other entities, each of which traced back to or was connected to Sanctioned Person 1. Specifically, in September 2019, the Defendant represented that Co-Conspirator 1's ownership structure had changed and identified an additional shell corporation as M/Y Tango's purported legal owner. The Defendant claimed that this shell corporation was owned by a Russian national employed by Sanctioned Person 1. Nonetheless, Sanctioned Person 1 and his family remained the sole primary user of the yacht, and thus the aforementioned transactions with U.S. persons were for the benefit of Sanctioned Person 1. The Superseding Indictment further alleges that the Defendant and his

coconspirators devised a scheme to ensure that U.S. financial institutions would continue to unknowingly process U.S. dollar transactions for the benefit of M/Y Tango and Sanctioned Person 1 even after the designation, including by using the code name "Fanta" to refer to the yacht in bank records and using intermediaries to mislead the financial institutions about the true beneficiaries of payments.

On January 30, 2024, the Grand Jury indicted the Defendant with five counts of bank fraud in violation of 18 U.S.C. § 1344, one count of Conspiracy to Defraud the United States and to Commit Offenses Against the United States in violation of 18 U.S.C. § 371, seven counts of violating IEEPA in violation of 50 U.S.C. § 1705, and four counts of international money laundering in violation of 18 U.S.C. § 1956(a)(2)(A). According to the Superseding Indictment, after the April 2018 designation, the Defendant and others devised a scheme to conceal Sanctioned Person 1's connection to the yacht, so that they could continue to operate M/Y Tango through the provision of goods and services from U.S. persons and the U.S. financial system, as described above. The Defendant and his coconspirators did so despite knowing that M/Y Tango was beneficially owned by Sanctioned Person 1 and that Sanctioned Person 1 was the sole user of M/Y Tango, and thus that Sanctioned Person 1 had an interest in transactions related to the yacht. Moreover, certain transactions with U.S. persons were for the direct and obvious benefit of Sanctioned Person 1, to include luxury bath robes for Sanctioned Person 1 and his guests, cable TV services of U.S. sports, and virtual teleconference software to allow Sanctioned Person 1 to conduct business meetings onboard the yacht.

The Defendant is in Switzerland and has not submitted to the jurisdiction of this Court. On April 30, 2024, the Defendant moved to dismiss the Superseding Indictment, arguing first that he

is entitled to make his claims despite that he has not submitted to the Court's jurisdiction.[3] Additionally, the Defendant argues that the Superseding Indictment reflects "a misreading of the sanctions law" because Sanctioned Person 1 owned less than 50% of the yacht itself, and therefore cannot state a claim. The Defendant argues that the bank fraud charges fail for the same reason. Alternatively, the Defendant moves to dismiss on the grounds that the law would be unconstitutional as applied to him. Through counsel, the Defendant has communicated with undersigned counsel for the United States, who asserted that Defendant does not intend to submit to the jurisdiction of this Court, but rather to remain in Switzerland.

## ARGUMENT

### I.    The Defendant Is Not Entitled to a Ruling on the Merits of the Motion Because He Has Not Submitted to this Court's Jurisdiction.

The Government incorporates by reference its full argument that the Court should decline to rule on the merits of the Motion under the Doctrine in its filings of July 21, 2023 (ECF No. 9) and August 2, 2023 (ECF No. 11).

A defendant may not seek an advantageous ruling from a court without submitting himself to its jurisdiction, including the consequences of a disadvantageous ruling if the court holds against him. The alternative would mean that a defendant could call upon the resources of a court, and then freely flout the court's decision if it denied him the relief he seeks, in contravention of the integrity due the court and the judicial process. *See Smith v. United States*, 94 U.S. 97, 97 (1876) ("It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render.");

---

[3] The Defendant previously moved to dismiss the original indictment on July 7, 2023. (ECF No. 8). That filing was largely identical to the Motion, with the addition of his arguments regarding the bank fraud charges. This filing is likewise largely duplicative of the Government's original opposition briefing (ECF No. 16), except for the discussion of the bank fraud charges.

*Dawkins v. Mitchell*, 437 F.2d 646, 647 (D.C. Cir. 1970) ("[I]f the ruling of this court were adverse to appellants, if their requested relief was denied, then there is no assurance whatsoever that appellants will follow the command of the law as enunciated by this court."). Courts invoke the Fugitive Disentitlement Doctrine (the "Doctrine") to avoid such a result. *See United States v. Shalhoub*, 855 F.3d 1255, 1259 (11th Cir. 2017) (describing the Doctrine as addressing "the difficulty of enforcement against one not willing to subject himself to the court's authority, the inequity of allowing a fugitive to use the resources of the courts only if the outcome is an aid to him, and the need to avoid prejudice to the nonfugitive party" (citations, internal quotation marks, and alterations omitted)).

The Defendant disputes that he is a "fugitive" within the meaning of the Doctrine and advocates that this Court adopt the minority view espoused only by the Second Circuit that he is not.[4] But he does not say that he will respect this Court's order if it holds against him on the Motion and come to the United States to face justice for his alleged crimes. Indeed, the Defendant all but concedes that he will not respect the Court's ruling when he asserts that a finding against him on the Motion would "maintain the status quo," which presumably means he will stay in Switzerland. Motion at 9. This Court is under no obligation to expend its time and resources only to have the Defendant ignore its decision, and so the Government respectfully requests that the Court follow the majority position and decline to rule on the merits of the Motion unless and until the Defendant submits himself to its jurisdiction. *See United States v. Martirossian*, 917 F.3d 883, 889 (6th Cir. 2019) ("[Defendant] has a readily available means of obtaining a ruling on his motion to dismiss the indictment. He can show up in the Southern District of Ohio, and the court as promised will

---

[4] As discussed in the Government's August 2, 2023 filing, the Defendant asserts that the Second Circuit's position is "consistent with precedent from" this Circuit, but that precedent arose in the entirely different context of civil asset forfeiture. *See* ECF No. 11 at 4.

decide his motion."); *Shalhoub*, 855 F.3d at 1263 ("That he does not want to submit himself to the jurisdiction of the federal courts does not make the legal remedies available to challenge his indictment inadequate."); *In re Kashamu*, 769 F.3d 490, 493 (7th Cir. 2014) ("If he wants to fight the charges, he has only to fly from Lagos to Chicago[.]").

## II.     The Superseding Indictment States a Legal Basis.

### A.     Standard of Review

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." *United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) ("The Supreme Court has instructed that an indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy.") (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also Collins v. Markley*, 346 F.2d 230, 232 (7th Cir. 1965) (en banc) ("The sufficiency of an indictment is to be measured by certain guide lines. First, the indictment standing alone must contain the elements of the offense intended to be charged, and it must be sufficient to apprise the accused of the nature of the offense. Second, after conviction, the record of the case must be sufficient so that the accused can plead the judgment in bar of any subsequent prosecution for the same offense.").

In reviewing a motion to dismiss an indictment at this early stage of the litigation, the Court must be able to determine a defect in the indictment on the face of the indictment alone. "A defendant may challenge a defect in the indictment or information—including its constitutionality—as long as the basis for the motion is *then reasonably available and the motion can be determined without a trial on the merits.*" *United States v. Naik*, No. 19-CR-373 (TSC),

8

2020 WL 534539, at *2 (D.D.C. Feb. 2, 2020) (internal citations and quotation marks omitted).

> **B.** **The Superseding Indictment Alleges Sanctions Evasion Charges Based on the Provision of Goods and Services "for the Benefit" and Dealing in the "Interests in Property" of Sanctioned Person 1.**

The Superseding Indictment alleges that the Defendant and his coconspirators knowingly and willfully exported, attempted to export, and caused U.S. persons and entities to export and attempt to export goods and services "for the benefit of" Sanctioned Person 1. The Court should read the use of "for the benefit of" to have its obvious plain meaning. *See, e.g., United States v. Young*, 107 F.3d 903, 909 (D.C. Cir. 1997) (rejecting defendant's argument that she did not know what "retaliatory action" meant where her conduct "clearly constituted 'retaliatory action' within any common-sense definition of that term."); *United States v. Robertson*, 588 F. Supp. 3d 114, 122 (D.D.C. 2022) (rejecting argument that statute was vague for not defining "official proceeding" because "the plain, obvious, and common sense meaning of that definition" met defendant's conduct (citation omitted)). Here, "for the benefit of" includes the Oxford English Dictionary definition of a "benefit" as "an advantage that something gives you; a helpful and useful effect that something has." https://www.oxfordlearnersdictionaries.com/us/definition/english/benefit_1. Black's Law Dictionary defines "beneficial" as "[t]ending to the benefit of a person; yielding a profit, advantage, or benefit; enjoying or entitled to a benefit or profit." https://thelawdictionary.org/beneficial/. The Superseding Indictment alleges (and the Defendant cannot dispute at this stage) that the operation of M/Y Tango "tended" to the benefit of Sanctioned Person 1, its primary user, and that therefore transactions related to the ongoing use, maintenance, and comfort of the Tango guests would all be for the benefit of Sanctioned Person 1.

Multiple courts have applied a similar common sense and broad definition of "for the benefit of" language in sanctions evasion cases. *See United States v. Atilla*, 966 F.3d 118, 127 (2d

Cir. 2020) (holding district court properly instructed jury on IEEPA charge that "[s]ervices may be provided indirectly, for example, if funds are transferred to Iran or on behalf of an Iranian person or business through an intermediary, or if they are transferred to a third party for the benefit of, or on behalf of, the government of Iran"); *Turner,* 836 F. 3d at 859 (holding no error in jury instruction that "the indictment charges [defendant] with willfully conspiring to provide services on behalf of and for the benefit of certain specially designated nationals"); *see also United States v. Tukiye Halk Bankasi A.S.*, 16 F. 4th 336, 341 (2d Cir. 2021) (affirming denial of motion to dismiss where indictment alleged defendant "allow[ed] the proceeds of sales of Iranian oil and gas deposited at [defendant] to be used to buy gold for the benefit of the Government of Iran" (vacated in part on other grounds)); *United States v. Turner*, 836 F. 3d 849, 863 (7th Cir. 2016) (affirming conviction for "willfully conspiring to provide services on behalf of and for the benefit of certain specially designated nationals"); *United States v. Homa International Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004) (affirming IEEPA conviction where "[p]lainly, the individual or entity in Iran that received the transferred funds benefited from [defendant's] services.").

Here, the Superseding Indictment identifies numerous examples of "funds, goods, or services" that were provided "for the benefit of" Sanctioned Person 1. First, the Superseding Indictment alleges that the Defendant and his coconspirators ("the coconspirators") secured U.S. services from U.S. correspondent banks, which were used to fund M/Y Tango's expenses, a trip to the Maldives for Sanctioned Person 1 and his guests, and the Tango's registration fees with the Cook Islands registry. Second, the coconspirators secured goods from U.S. companies in the form of customized luxury bathrobes, computers, and software, all of which were for use on M/Y Tango by its users, *i.e.*, Sanctioned Person 1. Third, the coconspirators secured services from U.S. companies in the form of internet, computing services, email hosting, email storage, weather

forecasting, and satellite television aboard M/Y Tango, as well as services from U.S. correspondent banks that processed U.S. dollar payments for M/Y Tango. *See In re Criminal Complaint*, No. 22-mj-067-ZMF, 2022 WL 1573361, at *2 (D.D.C. May 13, 2022) ("[A] sanctioned Russian Oligarch who wires funds via a front company that transits through a U.S. correspondent bank, violates IEEPA by causing the correspondent banker in the U.S. to (unwittingly) export financial services to a sanctioned entity." (citing *In the Matter of the Seizure and Search of the Motor Yacht Tango*, No. 22-SZ-5, 2022 WL 1165569, at *2 (D.D.C. Apr. 4, 2022)). All of these allegations support the Grand Jury's finding of probable cause of a violation of sanctions, and will be part of the evidence that the petit jury will consider in assessing whether those funds, goods, and services benefited Sanctioned Person 1 as the beneficial owner and primary user of M/Y Tango. It will be for the jury to decide whether the American-made robes Sanctioned Person 1 wore and the American-developed software and internet services he used to communicate with his Russian company, all while sailing aboard his yacht that relied on American-provided weather forecasting and flag-state registration fees paid for with U.S. dollars, were for his "benefit" or not.

Likewise, it will be for the jury to decide whether Sanctioned Person 1, as the beneficial owner and primary user of the yacht, had "an interest of any nature whatsoever, direct or indirect" in M/Y Tango. 31 C.F.R. § 589.304. *See OKKO Business PE v. Lew*, 133 F. Supp. 3d 17, 25 (D.D.C. 2015) ("[T]he D.C. Circuit has repeatedly held that the sweeping language of the IEEPA imposes no limit on the scope of interest blockable under the IEEPA, and that an interest when used with respect to property means an interest of any nature whatsoever, direct or indirect. A sanctions target need not have a legally enforceable ownership interest to justify a blocking under U.S. regulations." (internal quotation marks and citations omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 67 (D.D.C. 2002) ("[C]ourts have repeatedly upheld

OFAC's authority to interpret broadly the term 'any interest' in the identical provisions of the IEEPA, and its predecessor statute, the TWEA.").

Defendant's substantive argument essentially seeks to have this Court adopt his defense, which is premised on facts outside the Superseding Indictment and ignores a commonsense reading of the law. The Defendant does not dispute at this stage that Sanctioned Person 1 has been an SDN since April 6, 2018, that Sanctioned Person 1 was the primary user and beneficial owner of M/Y Tango, or even that transactions with U.S. persons occurred. Rather, the Defendant's argument is premised on an allegation that Sanctioned Person 1 was not a 50% owner of M/Y Tango at *all relevant times* during which transactions with U.S. persons occurred, and therefore that these transactions cannot be illegal under OFAC's rules. Motion at 5. The Superseding Indictment alleges that Sanctioned Person 1 was M/Y Tango's ultimate owner through a series of complicated corporate structures (*see* Superseding Indictment at ¶ 15), and also that the Defendant and his coconspirators conducted transactions "for the benefit of" Sanctioned Person 1 in violation of U.S. sanctions. To be sure, the Defendant may argue at trial his defense that Sanctioned Person 1 was not actually M/Y Tango's ultimate owner, that he did not benefit from the transactions related to M/Y Tango, and that he had no interest "of any nature whatsoever" in M/Y Tango, but those are factual questions that the jury will consider in determining whether the government has proved its case beyond a reasonable doubt that the Defendant violated U.S. sanctions. At this stage, however, the Defendant cannot prevail on this motion to dismiss the case on the basis of a factual dispute and by selectively ignoring the allegations in the Superseding Indictment.

**C.    The Defendant's Motion Is Based on a Misreading of the Regulations.**

The Defendant's Motion is premised on a misreading of OFAC's regulations. Specifically, the Defendant seeks to read the phrase "for the benefit of" out of the Ukraine-Related Executive

Orders and Ukraine-Related Sanctions Regulations. Instead, he argues, sanctions restrictions should be limited to the "50% Rule," encapsulated in 31 C.F.R. § 589.411 (the "50% Rule"), and the application of that rule to these facts means the Superseding Indictment must be dismissed on its face.

To be clear, the 50% Rule *automatically blocks property* in which an SDN has a 50% or greater legal ownership interest. While OFAC may list property of an SDN as "blocked property,"[5] the 50% Rule operates as a de facto way to block property even where OFAC has not designated the property as blocked.

However, the 50% Rule does not create a "safe harbor" such that any transactions outside that particular provision are permissible under IEEPA. The Defendant asserts that the 50% Rule "explicitly states that such transactions [with unblocked entities that are not more than 50% owned by sanctioned individual] *are not prohibited*," citing 31 CFR § 589.411 and OFAC FAQs 398. Motion at 3. But nothing in the text of the regulation or the FAQs establish such a "safe harbor." *See United States v. Three Sums Totaling $241,386.58 in Seized United States Currency*, 18-750 (RBW), 2021 WL 2255174, at *5 n.5 (D.D.C. June 3, 2021) (quoting Government's characterization of 50% Rule as merely a "guidance tool" and holding "regardless of the applicability of the Fifty Percent Rule . . . the Court is satisfied that the allegations implicating the claimant as acting in concert with SDGTs demonstrate the sufficiency of the Complaint."). The Defendant refers to OFAC FAQ 398, and concludes:

> OFAC urges caution when doing 'a transaction with an entity that is
> not a blocked person (a non-blocked entity) in which one or more
> blocked persons have a significant ownership interest that is less
> than 50 percent, or which one or more blocked persons may control

---

[5] OFAC, for instance, designated M/Y Tango as blocked property in March 2022. *See* https://home.treasury.gov/news/press-releases/jy0650.

> by means other than a majority ownership interest,' not because
> such transactions violate the sanctions regime, but rather because
> 'such non-blocked entities may become the subject of future
> designations . . .' Thus, unless and until future designations are
> made, such transactions are not proscribed by the regulation.

Motion at 13 (quoting OFAC FAQ 398). But *the very next lines* of FAQ 398 make clear that

transactions with non-blocked entities can, in fact, violate U.S. sanctions:

> In addition, persons should be cautious in dealing with such a non-
> blocked entity to ensure that they are not, for example, dealing with
> a blocked person representing the non-blocked entity, such as
> entering into a contract that is signed by a blocked person. Please
> also note that some sanctions programs (e.g., the Crimea region of
> Ukraine, Cuba, Iran, North Korea, Syria, and Venezuela) block
> certain persons without an OFAC designation; these blockings are
> based on criteria separate from OFAC's 50 Percent Rule, such as the
> blocking of persons that meet the definition of a blocked
> government.

FAQ 398, OFAC, https://ofac.treasury.gov/faqs/398. Thus, the very FAQ that the Defendant cites

would have put him on notice that the U.S. sanctions regime is broader than the 50% Rule.

Therefore, there is no "conflict" between the 50% Rule and the prohibitions on acting "on

behalf of or for the benefit of" or otherwise dealing in "an interest in property" of an SDN. They

all, by their plain reading, impose separate restrictions under IEEPA. Basic canons of statutory

interpretation require the Court to give full meaning to every provision of the regulations. *See*

*Loughrin v. United States*, 573 U.S. 351, 359 (2014). ("[Defendant]'s view thus runs afoul of the

cardinal principle of interpretation that courts must give effect, if possible, to every clause and

word of a statute.").

The Defendant's strained interpretation further ignores the plethora of case law holding

that IEEPA's restrictions are meant to apply broadly. *See, e.g., Dames & Moore v. Regan*, 453

U.S. 654, 671 (1981) ("The language of IEEPA is sweeping and unqualified. It provides broadly

that the President may void or nullify the 'exercising [by *any* person of] *any* right, power or

privilege with respect to . . . any property in which any foreign country has an interest." (alterations and emphasis in original) (quoting IEEPA)); *United States v. Lindh*, 212 F. Supp. 2d, 541, 561 (E.D. Va. 2002) ("This language manifestly sweeps broadly, as courts have consistently recognized in according deference to various sanctions programs under IEEPA and TWEA" (collecting cases)).

Courts have specifically rejected arguments like the Defendant's that would restrict the full breadth of the powers IEEPA bestows upon the President and OFAC, as well as the full breadth of the limitations imposed by U.S. sanctions. *See Dames & Moore*, 453 U.S. at 672 ("We . . . refuse to read out of § 1702 all meaning to the words 'transfer,' 'compel,' or 'nullify' . . . both the legislative history [of § 1702 and § 5(b) of the TWEA] and cases interpreting the TWEA fully sustain the broad authority of the Executive when acting under this congressional grant of power."); *United States v. Nejad*, 18-cr-224 (AJN), 2019 WL 6702361, at *3 (S.D.N.Y. Dec. 6, 2019) ("[Defendant] ignores the text of Section 560.204's prohibition . . . and in effect reads the modifier 'indirectly' out of the regulation entirely . . . The alternate interpretation [defendant] offers denies the regulatory prohibition its full effect, and, as such, runs contrary to cardinal canons of regulatory interpretation."). Thus, neither OFAC's guidance nor judicial precedent supports the Defendant's reading of the regulations.

Moreover, the Defendant's reading would render language in the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations superfluous. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW*

*Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks and citations omitted).[6] The Defendant argues that the "for the benefit of" language and the 50% Rule essentially proscribe the same conduct in different ways. *See* Motion at 20 ("Reading the two provisions together, engaging in a transaction with an entity that is 50% or more owned by a sanctioned individual is engaging in a transaction that is for the benefit of that individual and therefore violates § 589.201(b)(1) and the executive orders."). But he does not explain why OFAC would engage in such convoluted drafting to prohibit a simple category of conduct (*i.e.*, transactions with an entity legally owned 50% or more by an SDN), or how his reading is consistent with OFAC's definition of a property interest as "an interest of any nature whatsoever, direct or indirect." Nor does he explain how this reading does not render the "for the benefit" language in § 589.201(b)(1) and § 589.405(b)(1) superfluous.

If, as the Defendant argues, OFAC concluded that transactions that did not satisfy the 50% Rule "were not sufficiently 'for the benefit' of the sanctioned person that they should be prohibited" (Motion at 9), there would be no need for the "on behalf of or for the benefit of" language at all. *See National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 668 (2007) (rejecting interpretation that "would render the regulation entirely superfluous"). Thus, to limit their application as the Defendant proposes would "den[y] the regulatory prohibition its full effect," and thereby run afoul of the most basic rules of statutory interpretation.

### D.   Adopting Defendant's Interpretation of the Regulations Would Lead to Nonsensical Results.

If the Defendant's reading were correct, an SDN would need only to move his assets out

---

[6] The same is true for regulations and executive orders. *See United States v. Hassanzadeh*, 271 F.3d 574, 582 (4th Cir. 2001); *Countu v. Universities Research Association, Inc.*, 595 F.2d 396, 401, n.17 (7th Cir. 1979).

of his name to avoid the consequences of an OFAC designation. In fact, many SDNs hold assets in the names of shell companies and foundations legally controlled by trusted agents for the purpose of evading sanctions.[7] Tellingly, OFAC's response to such techniques has been to designate those companies, once OFAC learns of them, to prevent their continued use in sanctions evasion. *See, e.g.*, *Treasury Escalates Sanctions Against the Russian Government's Attempts to Influence U.S. Elections*, OFAC, Apr. 15, 2021, https://home.treasury.gov/news/press-releases/jy0126 (designating companies "[Russian oligarch Yevgeny] Prigozhin uses [as part of] a complex network of shell and front companies to evade U.S. sanctions and to obscure his ownership in property."). But if the Defendant's reading of OFAC FAQ 398 were correct, that would mean transactions involving those companies would be perfectly legal—so long as the SDN and his agents were smart enough to put those companies in someone else's name—and would not constitute evasion at all.

If an SDN could avoid the full breadth of the powers issued to the President and OFAC under IEEPA simply by taking his assets out of his name, the United States would be essentially powerless to prevent U.S. persons, companies, and financial institutions from dealing with

---

[7] *See* Yoshihiro Okumura, *Examining the Current State of Russian Sanctions Evasion*, DOW JONES, Mar. 21, 2023, https://www.dowjones.com/professional/risk/resources/risk-blog/examining-the-current-state-of-russian-sanctions-evasion ("One of the most common evasion techniques is to mask the ownership of assets belonging to sanctioned individuals or entities. Shell companies, family members and intermediaries are often used to conceal their assets."); *Global Advisory on Russian Sanctions Evasion Issued Jointly by the Multilateral REPO Task Force*, U.S. DEP'T OF THE TREASURY, Mar. 9, 2023, https://home.treasury.gov/system/files/136/REPO_Joint_Advisory.pdf ("Designated persons may further obfuscate their involvement in sanctions evasion schemes and efforts to stash away their wealth by using a combination of legal entities and legal arrangements such as trusts to ensure they remain undetected."); *How to spot sanctions evasion: Documented evasion tactics*, MOODY'S ANALYTICS, May 4, 2022, https://www.moodys.com/web/en/us/kyc/resources/insights/how-spot-sanctions-evasion.html (describing use of shell companies and specifically "[s]anctioned individuals keep[ing] their equity [in those shell companies] to below 50% [to] avoid the company being sanctioned by extension" as an "evasion tactic[]" "used to circumvent sanctions").

designated oligarchs, terrorists, narcotics traffickers, proliferators of weapons of mass destruction, and others who threaten the national security, foreign policy, or economy of the United States. *See United States v. Tajideen*, 319 F. Supp. 3d 445, 454 (D.D.C. 2018) (denying motion to dismiss IEEPA charges and agreeing with Government that "defendant's motion … invites the Court to dismantle a significant piece of the United States foreign policy and national security apparatus designed to reduce the threat from foreign terrorists."). The SDN would need only to operate through an intermediary or a shell company of which he legally owns less than 50%, and thereby avoid any of the law's restrictions. Aside from that being inconsistent with the broad, sweeping powers courts have regularly held that IEEPA supports, it would defy all common sense.

**E.      There Is No Ambiguity and the Rule of Lenity Does Not Apply.**

The Defendant's last-ditch reliance on the Rule of Lenity is misplaced. The Rule of Lenity "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute." *United States v. Shabani*, 513 U.S. 10, 17 (1994). It is a "canon of last resort." *United States v. Cook*, 594 F.3d 883, 890 (D.C. Cir. 2010). Multiple courts have rejected Rule of Lenity challenges to IEEPA. *See, e.g.*, *United States v. Mousavi*, 604 F.3d 1084, 1091 (9th Cir. 2010) ("[T]hese provisions are not ambiguous; rather, they broadly prohibit any transaction that is related to providing goods or services to Iran, and any attempt to engage in such a transaction."); *Lindh*, 212 F. Supp. 2d at 564 ("IEEPA is simply not an ambiguous statute, and, accordingly, the rule of lenity is inapplicable[.]"); *In re 650 Fifth Ave. and Related Properties*, 777 F. Supp. 2d 529, 549 (S.D.N.Y. 2011) ("Where the text and purpose of the statute so strongly suggest that it would make no sense to interpret 'services' to exclude the alleged activities here, there is no need to apply the rule of lenity, for that is a doctrine of last resort, to be used only after the traditional means of interpreting authoritative texts have failed to dispel any ambiguities."

(internal quotation marks and citation omitted)); *United States v. Islamic American Relief Agency*, 2009 WL 3834130, at \*3 (W.D. Mo. Nov. 13, 2009) ("[T]he language, legislative purpose and history of the IEEPA do not support Defendants' interpretation. There is simply no ambiguity.").

Given IEEPA's, the Ukraine-Related Executive Orders', and the Ukraine-Related Sanctions Relations' broad language, guidance provided by OFAC in its press releases and FAQ's, and the Government's prior prosecutions of similar sanctions evasion conduct, there is no basis to apply the Rule of Lenity here. *See id.* at \*3 (rejecting Rule of Lenity argument because "a reasonable person would understand that monetary funds were not covered [by an IEEPA exception], given the examples in the statute and common sense."). The Superseding Indictment has alleged that the transactions on behalf of and for the benefit of an SDN fell afoul of the "plain language" of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations, and so the Rule of Lenity is inapplicable. *See Mousavi*, 604 F.3d 1084, 1091 (9th Cir. 2010) ("The plain language of this regulation prohibits an agreement to provide future services to Iran."). The fact that the Defendant has put forward a narrower interpretation of the law—one that is divorced from its plain language, legislative history, and prior enforcement—does not change that fact. *See Shabani*, 513 U.S. at 17 ("To require that Congress explicitly state its intention *not* to adopt petitioner's reading would make the rule applicable with the mere possibility of articulating a narrower construction, a result supported by neither lenity nor logic." (internal quotation marks and citations omitted)).

### III.   There Is No Basis to Dismiss the Superseding Indictment on Due Process Grounds.

Defendant's argument that the Superseding Indictment should be dismissed on due process grounds also fails. The Motion alleges that the Defendant "was not on fair notice of [the government's] interpretation [of OFAC's regulations] at the time of the alleged conduct, and the

application of that regime to Mr. Osipov would therefore violate the Due Process Clause." Motion at 23. Defendant's claim is specious.

First, to the extent the Defendant claims that he did not have actual notice of the application of the regulation to his conduct, that is a defense that he may raise to dispute the requisite *mens rea* to violate IEEPA. The Superseding Indictment alleges that the Defendant was, in fact, knowledgeable about the application of U.S. sanctions to this conduct. The Defendant's allegations to the contrary are based, again, on evidence not before this Court.

Second, the Defendant's apparent claim that the regulations are so vague that they fail to put him on notice and thus deny him of Due Process also fails. A law is not unconstitutionally vague "if the general class of offenses to which the statute is directed is plainly within its terms[.]" *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982). To put it differently, the law need only be written such that "[a]n ordinary person would have an intuitive understanding of what is proscribed[.]" *United States v. McHugh*, 583 F. Supp. 3d 1, 27 (D.D.C. 2022). The D.C. Circuit has explained:

> Even as the vagueness inquiry refers to the law's meaning to the 'ordinary person,' a statutory term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere. When interpreting a statutory term, we are not concerned with vagueness in the sense that the term requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask. Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all.

*United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (international quotation marks, alterations, and citations omitted). Even less specificity is required for regulations governing professional services, like those rendered by the Defendant.

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior

20

> carefully, can be expected to consult relevant legislation in advance
> of action [and may] clarify the meaning of the regulation by [their]
> own inquiry, or by resort to an administrative process.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1982). Courts

have rejected Constitutional vagueness challenges to IEEPA on those grounds. *See United States*

*v. Quinn,* 401 F. Supp. 2d 80, 100 (D.D.C. 2005) ("[T]he Iran trade embargo laws at issue here are

not apt to sweep within their coverage the everyday acts of average citizens. Rather, they govern

the activities of relatively sophisticated individuals who are deliberately engaged in international

commerce and, therefore, must be familiar with (if not expert in) various legal regimes—e.g.,

customs duties and tariffs—in multiple countries."); *United States v. Amirnazmi,* 645 F.3d 564,

589 (3d Cir. 2011) (holding that regulation was not unconstitutionally vague because of "the

sophisticated nature of those required to consult the IEEPA regulations coupled with the

availability from OFAC officials on electronic and telephone hotlines[.]").

IEEPA is also subject to a less strict vagueness standard because the statute requires

specific intent. The Supreme Court has long recognized that a willfulness requirement protects

defendants from the concerns that arise from an unconstitutionally vague statute, because "[o]n no

construction can the statutory provisions . . . involved become a trap for those who act in good

faith. A mind intent on willful evasion is inconsistent with surprised innocence." *United States v.*

*Ragen*, 314 U.S. 513, 524 (1942). IEEPA includes such a requirement. *See Amirnazmi*, 645 F.3d

at 589 ("IEEPA's scienter requirement counseled against a vagueness finding."); *United States v.*

*Hescorp, Heavy Equipment Sales Corp.*, 801 F.2d 70, 77 (2d Cir. 1986) ("[T]he government would

have been required to prove that Hescorp had specifically intended to violate the Iranian Embargo

Regulations. As we recently recognized, a requirement of willfulness makes a vagueness challenge

especially difficult to sustain.").

Unsurprisingly then, the Defendant has not identified any caselaw from any court holding that the "for the benefit of" language (or any other language) in the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations (or any number of other executive orders and implementing regulations) is unconstitutionally vague. In fact, at least one court has rejected defendants' argument that the phrase "for the benefit of" was vague in a case brought under the Export Control Act. *See United States v. Brumage*, 377 F. Supp. 144 147 (E.D.N.Y. 1974) ("As for the phrase 'for the benefit of,' defendants question whether 'if one exports goods to a non-Communist dominated national and knows that the goods may be used in some remote manner to aid, promote, or for the advantage of a Communist-dominated nation, he is committing a crime."). The court held, "defendants' claim of vagueness loses substance and amounts to little more than a contention that the [Export Control] Act permits the exercise of excessive discretion in implementation. Delegation by Congress to the President of regulatory authority over foreign affairs, and exports in particular, has been a long-standing practice." *Id.* at 149-50. In another case, the court rejected a similar challenge to the term "services" and held "a person of ordinary intelligence [would understand] the services that should not be provided to or *for the benefit of* SDGTs [specially designated global terrorists]." *Humanitarian Law Project v. U.S. Treasury Dept.*, 578 F.3d 1133, 1146-47 (9th Cir. 2009) (emphasis added).

The Defendant argues that "[n]either the regulation nor the government's official public guidance relating to it provide fair notice that engaging in a transaction with an entity that is not blocked and that is not owned 50% or more by a sanctioned individual would be punishable as a crime." Motion at 22. But again, that simply is not true. The Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations explicitly prohibit conduct, like the Defendant's, that is for "the benefit of" an SDN. If there is any confusion around that phrase at all, it arises only

from the Defendant's own contention, *his defense*, that the 50% Rule is somehow meant to define what "for the benefit of" means. But a defendant may not use his defense to inject ambiguity into a statute or regulation. *See Hescorp, Heavy Equipment Salse Corp.*, 801 F.2d at 77 ("[T]he ambiguity Hescorp points to in the Regulations arises mainly from Hescorp's *tortured attempt* to read the (a)(4) exemption into subsection (a)(1) and its unjustified assumption that the phrase 'service contract' should be given a specialized connotation from the world of commercial law[.]" (emphasis added)). Here, an ordinary person would understand that they were prohibited from engaging in conduct for the purpose of providing a benefit., *i.e.*, an advantage or a helpful and useful effect, to an SDN. *See Humanitarian Law Project*, 561 U.S. at 24 (dismissing vagueness challenge based on the dictionary definition of "service" and context of statute); *United States v. Gonzales*, No. 20-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020) (dismissing vagueness challenge because "the terms 'transaction' and 'dealing' are everyday terms with widely understood ordinary meanings that define concrete measurable actions" and citing dictionary definitions).

The Defendant is free to argue to a jury that the funds, goods, and services from U.S. companies and financial institutions that facilitated M/Y Tango's operation as a luxury yacht somehow did not benefit that yacht's beneficial owner and primary user, Sanctioned Person 1. He is also free to argue to the jury that even if they did benefit Sanctioned Person 1, he did not provide those benefits willfully within the meaning of IEEPA. But the idea that he was not on notice that the law prohibited providing such benefits to an SDN is divorced from the reality of the plain language of the Ukraine-Related Executive Orders and Ukraine-Related Sanctions Regulations, guidance from OFAC and U.S. courts, and the many prior prosecutions for similar conduct. Thus, his Constitutional vagueness challenge must fail.

IV.    **The Defendant's Bank Fraud Argument Is Divorced from Case Law and a Plain Reading of the Statute.**

A.    **The Alleged Misrepresentations to Financial Institutions Were Material.**

The Defendant essentially suggests that the Superseding Indictment alleges that he caused U.S. financial institutions to engage in lawful transactions with unblocked parties that happened to benefit a Specially Designated National. But the Superseding Indictment alleges that the Defendant and his coconspirators devised a scheme specifically to deceive those financial institutions into engaging in transactions for the direct benefit and on behalf of Sanctioned Person 1 and his beneficially owned yacht. Superseding Indictment at ¶¶ 2, 40. Tricking financial institutions into processing transactions connected to a sanctioned person, which they would not have processed if they had known the truth, was the express purpose of the fraud. *Id*. at ¶ 6. Indeed, as the Superseding Indictment alleges, the coconspirators "engaged in a scheme to obfuscate Sanctioned Person 1's ownership interest in TANGO and otherwise to obfuscate TANGO's connection to U.S. dollar transactions and U.S. businesses . . . [d]ue to the scrutiny of U.S. banks and their financial controls, and as a result of the Treasury Department's sanctions, among other concerns." *Id*. at ¶ 4.

The Defendant goes on to argue that the bank fraud statute requires that the alleged misrepresentation cannot be material unless it causes a financial institution to inadvertently commit a crime, and thus if the IEEPA charges fail to state a claim, the bank fraud charges must fail as well. Motion at 21-25. The Defendant is wrong that the IEEPA charges should be dismissed for the reasons discussed above, but even if that were not the case, nothing in the language of 18 U.S.C. § 1344 or the case law supports such a constrained reading of the statute.

"In general, a false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed."

*Neder v. United States*, 527 U.S. 1 (1999). In *United States v. Weigand*, defendants allegedly skirted bank restrictions on marijuana purchases by creating fictious businesses (and websites and bank accounts for those businesses) that purportedly sold products unrelated to marijuana. 482 F. Supp. 3d 224, 232 (S.D.N.Y. 2020). To put it differently, banks were led to believe they were processing payments for dog food or face cream, when the payments were actually for marijuana. The court held that defendants' materiality argument "borders on the frivolous," because "[t]he indictment allege[d] that many issuing banks would not have approved these transactions if they had known marijuana was involved." *Id*. at 237. That was the case "even in states like California and Oregon that permit the sale of marijuana." *Id*. at 232.

The Defendant's reliance on *United States v. Zarrab* is misplaced. In that case, the court agreed with the government that "by concealing the true beneficiaries of these transactions from the U.S. banks, Zarrab and his coconspirators, among other things, robbed the U.S. banks of the ability to properly assess the risk from engaging in these transactions and exposed the banks to actual or potential loss." No. 15-cr-867 (RMB), 2016 WL 6820737, at *13 (S.D.N.Y. Oct. 17, 2016). If anything, the court's focus on whom the underlying payments allegedly benefited supports the Government's position here; the Superseding Indictment alleges that Sanctioned Person 1 (*i.e.*, a blocked person) benefited from the transactions that funded M/Y Tango's operation as a luxury yacht, in the same way the transactions in *Zarrab* "were for the benefit of blocked Iranian entities." *Id*. at *2 (quotation marks and citation omitted). Certainly, the *Zarrab* court credited the government's argument that a bank that violated IEEPA would be subject to harm in the form of "massive fines and forfeiture." *Id*. at *14. But the court did not suggest that that was the only form of harm that qualified under the bank fraud statute. Indeed, the court referenced a deferred prosecution agreement a bank had entered into on IEEPA charges as merely

an "example" of the harm a financial institution could face. *Id.* The court further reasoned that "where, as here, it is alleged that a defendant 'intentionally withholds or falsifies material information the defendant will have already exposed the bank to immediate harm by denying the bank the right to control its assets by depriving the bank of the information necessary to make *discretionary* economic decisions." *Id.* (emphasis added) (quotation marks, citations, and alterations omitted). If, as the Defendant argues, a bank fraud charge must be premised on a misrepresentation that conceals the illegality of a transaction, there would be nothing "discretionary" about the bank's decision over whether to complete that transaction if it knew the truth. *See also United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007) ("[M]ost bank fraud is committed when a defendant makes a misrepresentation to a bank in an effort to persuade the bank to make a *discretionary* decision in a way that benefits him." (emphasis added)).

The *Zarrab* court's analysis is consistent with wider precedent, including Supreme Court guidance, about what qualifies as "harm" for purposes of bank fraud. *See Weigand*, 482 F. Supp. 3d at 235 ("In describing the sorts of harm that qualify . . . the Supreme Court's bank fraud precedents cast a wide net." (collecting cases)). "[T]he [bank fraud] statute . . . demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw v. United States*, 580 U.S. 63, 67 (2016). Instead, it is sufficient if the defendant "allegedly sought to injure th[e bank's property] interests in [the bank's] funds, and [the] defendant[] allegedly sought to injure those interests by causing the banks to relinquish those funds through deception." *Weigand*, 482 F. Supp. 3d at 236.

Further, even if it were the case that the underlying U.S. dollar transactions did not violate IEEPA (it is not), financial institutions nevertheless faced some risk of harm from processing those transactions. As the Superseding Indictment lays out, the Bank Secrecy Act ("BSA") requires

financial institutions to establish anti-money laundering measures and to assist U.S. government agencies in preventing money laundering, including by reporting suspicious activity to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). Superseding Indictment at ¶ 12. FinCEN has specifically warned U.S. financial institutions about "serious deficiencies in the counter-money laundering systems of the Russian Federation," as well as the threat posed by politically exposed persons ("PEPs"). *Id*. at ¶ 13.

The Superseding Indictment alleges that the Defendant and his coconspirators concealed from U.S. financial institutions the fact that the underlying transactions were for M/Y Tango and its beneficial owner, Sanctioned Person 1, and thereby caused those financial institutions to process transactions "they would not have otherwise processed or would have investigated." *Id*. at ¶ 6. Even putting aside the specious implication that the Defendant and his coconspirators' development of a code word and intermediary payment system to use with the banks had nothing to do with a scheme to evade sanctions, those misrepresentations "enabled Sanctioned Person 1 to evade the Treasury Department's 'Know Your Customer' regulations applicable to U.S. financial institutions and the reporting of the aforementioned transactions to the Treasury Department." *Id*. at ¶ 5. The misrepresentations thereby exposed those financial institutions to regulatory scrutiny from FinCEN and/or a BSA investigation by the Department of Justice. The fact that no such investigation occurred is of no moment, as the mere risk of harm is sufficient for purposes of establishing bank fraud, and "[r]isk of loss is to be defined broadly." *Matter of Search of Multiple Email Accounts*, 585 F. Supp. 3d 1, 15 (D.D.C. 2022) (citing *United States v. Williams*, 865 F.3d 1302, 1317 (10th Cir. 2017)). *See United States v. Goodale*, 530 F. App'x 338, 342 (5th Cir. 2013) ("[T]here need not be actual loss or liability by the bank, or even a *substantial risk* of loss or liability, to support a bank-fraud conviction.").

**B.      The Superseding Indictment Alleges Affirmative Misrepresentations to Financial Institutions.**

The Defendant argues that "there is no duty when allegedly causing a lawful credit card transaction, checking or other type of similar payment transaction to occur to disclose that the transaction could somehow ultimately benefit a sanctioned person." Motion at 24. Again, putting aside that the transactions were not lawful for the reasons explained above (and putting aside the Defendant's apparent concession that the relevant transactions benefited Sanctioned Person 1, in clear contravention of IEEPA's prohibition on transactions that are "for the benefit of" a sanctioned party), bank fraud charges can be premised on an omission. *See Matter of Search of Multiple Email Accounts*, 585 F. Supp. 3d at 14 ("The 'language of the bank fraud statute should be broadly construed so as to reach anyone engaged in a scheme or artifice to defraud, including a scheme to actively conceal material information through deceptive conduct, with the intent to mislead and suppress the truth, *even in the absence* of an independent legal duty to disclose such information.'" (quoting *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000)). But even more than that, the bank fraud charges here are not premised only on an omission. Instead, the Defendant is alleged to have aided and abetted affirmative misrepresentations to financial institutions that the underlying transactions were for: (a) a yacht called the "Fanta", (b) the yacht management company's employees, or (c) the yacht's U.S.-based internet service provider that contracted with other U.S. companies on the yacht's behalf. Superseding Indictment at ¶¶ 24-40. The Motion simply ignores that the Superseding Indictment includes these allegations. The Defendant cannot affirmatively lie and then claim he had no duty to disclose the truth. *See Zarrab*, 2016 WL 6820737, at *12 ("Under the bank fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under

which they were made, not misleading." (quoting *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (alterations omitted)).

###### C.   The Defendant Ignores the Superseding Indictment's Allegations Concerning Obtaining Bank Services and Properties.

The Motion claims that "the Superseding Indictment does not even purport to allege that [he] intended to obtain moneys or other property owned by, or under the custody or control of, a financial institution." Motion at 25. But again, that argument simply ignores what is in the Superseding Indictment, which specifically alleges that the purpose of this scheme was to "obtain services and properties of financial institutions, *i.e.*, correspondent banking services and monies under the control of the financial institutions" and that the Defendant, together with others, sought to "obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of, a financial institution[.]" Superseding Indictment at ¶¶ 23, 40. Those types of services and properties are squarely in the realm of interests that courts have held sufficient to support a bank fraud charge. *See United States v. Atilla*, 966 F.3d 118, 127 (2d Cir. 2020) (affirming conviction on bank fraud charges where jury found that defendant "obtained or agreed to obtain, through deceit, funds in the custody of one of several named federally insured banks located in the United States" in connection with transactions processed for the benefit of Iran); *Weigand*, 482 F. Supp. 3d at 236 (rejecting defendants' argument that "the only bank property at stake here is the ethereal right to accurate information," because "[t]he banks had concrete property interests in these funds, and defendants allegedly sought to injure those interests by causing the banks to relinquish those funds through deception."); *Zarrab*, 2016 WL 6820737, at *12 (holding "the Indictment clearly states the elements of a conspiracy to commit bank fraud" where defendant allegedly sought "to obtain moneys, funds, credits, assets securities, and other property owned by

and under the custody and control of a US financial institution" by causing banks to unknowingly process transactions in violation of IEEPA).

**V.      The Money Laundering Counts Are Valid.**

For the reasons explained above, the Superseding Indictment adequately alleges charges under IEEPA and the bank fraud statute. There is therefore no reason to dismiss the counts charging the Defendant with money laundering for transporting, transmitting, and transferring funds in connection with those alleged violations.

## CONCLUSION

For the foregoing reasons, the Government respectfully opposes the Defendant's Motion to Dismiss and requests that the Motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:  */s/   Maeghan Mikorski*
Maeghan Mikorski (N.Y. Bar No. 5406202)
Karen P. W. Seifert
Assistant United States Attorneys
National Security Section
601 D Street, N.W.
Washington, D.C.  20530
(202) 815-9024
maeghan.mikorski@usdoj.gov