## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| v. | **No. 22-cr-369-TSC-ZMF** |
| **VLADISLAV OSIPOV,** | |
| **Defendant.** | |

## REPORT AND RECOMMENDATION

Defendant Vladislav Osipov is trying to have his cake and eat it, too. He is a fugitive who is avoiding the court. Simultaneously, he is moving from the comfort of his residence in Switzerland to dismiss the charges against him. Defendants who want to make use of a court must first appear before it. For the reasons below, the undersigned recommends DENYING the Defendant's motion.

## I.    BACKGROUND

In 2018, the U.S. Department of Treasury's Office of Foreign Assets Control ("OFAC") designated Sanctioned Person 1 as a "Specially Designated National." *See* Superseding Indictment ("Sup. Indict.") ¶ 3, ECF No. 19. Sanctioned Person 1 is a Russian oligarch who owned the 255-foot luxury superyacht "Tango." *See* Sup. Indict. ¶ 1; *see also In re Seizure & Search of Motor Yacht Tango*, 597 F. Supp. 3d 149, 151 (D.D.C. 2022). OFAC's designation triggered obligations under the Bank Secrecy Act for financial institutions to, among other things, block transactions for the benefit of Sanctioned Person 1. *See* Sup. Indict. ¶ 11.

The government alleges that Osipov managed the Tango in violation of U.S. sanctions law. *See* Sup. Indict. ¶¶ 1–8. Osipov obfuscated the Tango's true ownership and then—through a series of shell companies—conducted convoluted financial transactions related to it with U.S. companies. *See, e.g.,*

Sup. Indict. ¶¶ 24–40, 56. In so doing, Osipov and others conspired to circumvent sanctions. *See* Sup. Indict. ¶¶ 14–19, 53–54.

On November 15, 2022, the grand jury returned an indictment charging Osipov with one count of conspiracy to defraud the United States, seven counts of violating the International Emergency Economic Power Act ("IEEPA"), and six counts of money laundering. *See* Indictment, ECF No. 1. On July 7, 2023, Osipov moved to dismiss that indictment. *See* Mot. Vladislav Osipov Dismiss Indict., ECF No. 8. On July 21, 2023, the government filed a notice requesting that Judge Chutkan clarify whether the fugitive disentitlement doctrine applied. *See* Gov't Notice Filing Def. Who Has Not Submitted Himself Juris. Ct. ("Notice"), ECF No. 9. On August 30, 2023, Judge Chutkan ordered the government to reply to Osipov's motion to dismiss. *See* Min. Order (Aug. 30, 2023).

On January 30, 2024, the government returned a superseding indictment charging Osipov with five counts of bank fraud, one count of conspiracy to defraud the United States, seven counts of violating the IEEPA, and four counts of money laundering. *See* Sup. Indict. On February 12, 2024, Judge Chutkan referred this case to the undersigned for full case management, including the issuance of a Report and Recommendation on any dispositive motions. *See* Min. Order (Feb. 12, 2024). On April 30, 2024, Osipov filed a second motion to dismiss, largely tracking the first motion. *See* Mot. Vladislav Osipov Dismiss Sup. Indict. ("Mot. Dismiss Sup. Indict."), ECF No. 29. Osipov argues that the superseding indictment failed to state an offense. *See id.* at 10.

Before considering Osipov's arguments, though, is the government's claim that the fugitive disentitlement doctrine applies. *See* Gov't Opp'n Mot. Dismiss Sup. Indict. ("Opp'n") 6, ECF No. 30.[1] Since the filing of the first indictment, Osipov has not submitted to U.S. authorities. *See id.* at 5. He remains in Switzerland, a country that will not extradite him. *See* Mot. Dismiss Sup. Indict. at 13, n.2.

---

[1] If this doctrine applies, it resolves both motions to dismiss in the government's favor.

## II.    DISCUSSION

### A.    The Doctrine

"What is known loosely as the fugitive disentitlement doctrine generally permits a federal court to insist on a defendant's presence in the jurisdiction before it resolves challenges to the criminal charges." *United States v. Martirossian*, 917 F.3d 883, 885 (6th Cir. 2019). The doctrine "exists to encourage compliance with the law and to protect against [defendants] that 'attempt to invoke from a safe distance only so much of a United States court's jurisdiction as might secure . . . a dismissal while carefully shielding [himself] from the possibility of a penal sanction.'" *United States v. Türkiye Halk Bankasi A.S.*, 426 F. Supp. 3d 23, 40–41 (S.D.N.Y. 2019) (internal quotations omitted) (quoting *United States v. Hayes*, 118 F. Supp. 3d 620, 625–26 (S.D.N.Y. 2015)). The doctrine originated as an equitable bar to appeal while an appellant who escaped from imprisonment remained on the lam. *See Smith v. United States*, 94 U.S. 97, 97 (1876). "Dismissal was an exercise of the court's inherent power 'to refuse to hear a criminal case in error, unless the convicted party . . . is where he can be made to respond to any judgment [the court] may render." *United States v. $6,976,934.65, Plus Int. Depos'd into Royal Bank of Scot. Int'l, Acct. No. 2029-56141070, Held in Name of Soulbury Ltd.*, 554 F.3d 123, 127 (D.C. Cir. 2009) [hereinafter *$6,976,934.65*] (quoting *Smith*, 94 U.S. at 97). Over time, courts and Congress have expanded the doctrine to civil forfeiture proceedings, criminal cases where a defendant has fled the country, and more. *See, e.g.*, *id.* at 124–33 (applying the Civil Asset Forfeiture Reform Act of 2000).

### B.    Fugitive Defined

The question here is whether the doctrine also applies to a defendant who refuses to appear for criminal proceedings in the United States. Courts are divided. The Sixth and Seventh Circuits have applied the doctrine because such individuals are "fugitives." *See Martirossian*, 917 F.3d at 889–90; *see also In re Kashamu*, 769 F.3d 490, 493–94 (7th Cir. 2014). The Second Circuit has found the

opposite. *See United States v. Bescond*, 24 F.4th 759, 763–64 (2d Cir. 2021). The D.C. Circuit has not

spoken on the matter.[2]

      The courts split over what constitutes a fugitive. The Seventh Circuit determined that a criminal

defendant who "didn't literally flee the United States, since he was never in the United States" was

nonetheless "functionally a fugitive" because "he *knew he was under indictment* in this country, yet

rather than come here to fight the validity of the government's charges, he fought tooth and nail" to

evade prosecution. *In re Kashamu*, 769 F.3d at 493 (emphasis added).[3] Similarly, the Sixth Circuit

---

[2] Defendant incorrectly characterizes "precedent from the D.C. Circuit" as being consistent with *Bescond*. Mot. Dismiss Sup. Indict. at 9 (citing *$6,976,934.65*, 554 F.3d at 123 and *United States v. Any & All Funds on Deposit in Acct. No. XXXXX-XXXXXXXX at HSBC Bank PLC, 55 Corp. St., Coventry, U.K.*, 87 F. Supp. 3d 163, 168 (D.D.C. 2015)). Both D.C. cases are civil forfeiture cases. "As a court-made rule, fugitive disentitlement [was inapplicable] in civil cases." *$6,976,934.65*, 554 F.3d at 127. Congress subsequently enacted 28 U.S.C. § 2466 to import this common law criminal doctrine to civil cases. *See id.* Section 2466(a) requires that the alleged fugitive has "notice or knowledge" that a warrant has issued, that the criminal and civil cases are related, and that the claimant remains outside the United States "in order to avoid criminal prosecution." 28 U.S.C. § 2466(a)(1). These civil statutory hurdles do not apply to a criminal case.

[3] Defendant argues *In re Kashamu* does not apply because that court did not explicitly invoke the doctrine. *See* Reply Vladislav Osipov Gov't's Opp'n Mot. Dismiss Sup. Indict. ("Reply") 4, ECF No. 31. Yet even the *Bescond* court noted the relevance of this case in the circuit split. *See Bescond*, 24 F. 4th at 773. And regardless of jargon, the Seventh Circuit's underlying analysis of who qualifies as a "fugitive" is directly relevant to this Court's analysis of the same question.

Defendant then attempts to characterize *In re Hijazi*, another Seventh Circuit case, as "set[ting] forth" that Circuit's "approach to the fugitive disentitlement doctrine." Reply at 4 (citing 589 F.3d 401, 412–13) (declining to find defendant who constructively fled a fugitive). Notably, *In re Kashamu* is the more recent Seventh Circuit case. Moreover,

> Hijazi and [Osipov] do not stand in the same shoes. When Hijazi 'learned of the indictment' against him, 'he surrendered to the Kuwaiti authorities. Had those authorities been inclined to detain him and then to turn him over to the U.S. prosecutors, they could have done so. Or they could have prosecuted him under Kuwaiti law.' [*In re Hijazi*, 589 F.3d] at 412–13. They did neither and instead objected to the United States' conduct in issuing the indictment. *Id.* at 405. [Osipov has] not submit[ted] to [any] authorities. Whatever the distant reaches of the fugitive disentitlement doctrine, it is reasonable—and certainly not the

considers a defendant a "fugitive" whether they "actual[ly or] constructive[ly] fl[ee]." *Martirossian*, 917 F.3d at 890. That is, the court applies the doctrine "(1) to defendants who leave the country before or after an indictment to evade justice or (2) to defendants who *refuse to answer an indictment* or arrest warrant after they issue." *Id.* (emphasis added).

The Second Circuit's reasoning to the contrary is unpersuasive.[4] The court in *Bescond* first conducted a textual analysis of the word "fugitive" to determine that the foreign defendant was not one. *See* 24 F.4th at 771. But unlike in statutory interpretation, there is no obligation to cabin the application of common-law doctrine to a dictionary entry. "Textual analysis is minimally useful [here, so] determinations as to what constitutes [a 'fugitive'] rest[s] on common law." *Park v. Park*, 492 B.R. 668, 682 (Bankr. S.D.N.Y. 2013).

The common law categorizes two types of fugitives: actual and constructive. *See Bescond*, 24 F.4th at 771. Like the Sixth Circuit, the Second Circuit considered the doctrine to apply to both actual and constructive fugitives. *See id.* at 771–72. The Second Circuit, however, narrowly defined the second category to only include those who committed a crime in the United States but are "outside the country—for whatever reason—when [they] learned that [their] arrest[ ] w[as] sought and who then refused to return to the United States in order to avoid prosecution." *Id.* at 772 (quoting *Collazos v. United States*, 368 F.3d 190, 199 (2d Cir. 2004)). The Second Circuit did not consider the Sixth Circuit's broader definition of fugitives, which covers "defendants who refuse to answer an

---

> denial of a clear and indisputable right—to distinguish between a
> defendant who submits to authorities and one who doesn't.

*Martirossian*, 917 F.3d at 890; *see* Opp'n at 5.

[4] Defendant argues, without any support, that this Court ought to adopt *Bescond*'s reasoning "[b]ased on its recency[.]" Surreply Vladislav Osipov Resp. Gov't Reply Supp. Notice 2, ECF No. 12. But recency does not resolve a circuit split when the factual underpinning has remained the same between the cases. A fugitive in 2014 was no different than one in 2021. This Court instead looks to the merits of the reasoning to decide which court to follow.

indictment" whether they physically committed the crime in the United States or not. *Martirossian*, 917 F.3d at 890. Strangely, the Second Circuit conceded that a broader definition to include "fugitive status to persons who were not in the United States to begin with" makes sense in "the forfeiture context specifically[.]" *Bescond*, 24 F.4th at 772. Indeed, "[t]he logic of the [Second Circuit]'s new rule would appear to apply equally to an overseas foreign terrorist who kills Americans abroad, and an overseas foreign terrorist who directs an attack on U.S. soil." *Id.* at 779 (Livingston, C.J., dissenting). It is antiquated thinking to employ a cramped definition of fugitive focused on the location of the crime and criminal in an increasingly borderless world where crime—like work, marriages, and funerals—can be done completely remotely.

This Court adopts the reasoning of the Sixth and Seventh Circuits. The fugitive disentitlement doctrine applies to foreign defendants who refuse to appear. "The purposes behind the doctrine apply in both settings," i.e., regardless of whether a defendant flees the United States or simply refuses to appear. *Martirossian*, 917 F.3d at 890. (citing *Ortega-Rodriguez v. United States*, 507 U.S. 234, 242 (1993)). "Federal courts do not play 'catch me if you can.' If a defendant refuses to show up to answer an indictment, ignores an arrest warrant, or leaves the jurisdiction, the court may decline to resolve any objections to the indictment in his absence." *Id.* at 885. To find otherwise would consign the Court to writing "what amount[s] to [an] advisory opinion[] that [is] unlikely to be enforced if the court rules against the fugitive." *Id.* at 890.

Osipov is a fugitive. *See In re Kashamu*, 769 F.3d at 493. He now resides in Switzerland. *See* Mot. Dismiss Sup. Indict. at 12–13. He has not waived extradition. *See* Notice at 1. In fact, despite knowledge of the indictment and superseding indictment, Osipov has yet to submit himself to the jurisdiction of this Court in the nearly two years that have followed. *See id.* at 1. He will remain a fugitive until he "show[s] up" to "take the bitter with the sweet." *Martirossian*, 917 F.3d at 889–90.

Osipov responds that the government's actions to make him "appear" as a fugitive are a "publicity stunt." *See* Mot. Dismiss Sup. Indict. at 13, n.2. However, "[t]he Court fails to perceive a

correlation between accounts of political leaders and others who have taken a keen interest in these court proceedings and the more mundane and easily resolved question whether [a defendant must first appear to contest an indictment]." *Türkiye Halk Bankasi A.S.*, 426 F. Supp. 3d at 34. Osipov must appear. *See id.*

      C.    <u>Application of the Doctrine</u>

      The Court next considers in its discretion if the fugitive disentitlement doctrine applies.[5] *See Degen v. United States*, 517 U.S. 820, 824 (1996). "The fugitive disentitlement doctrine is grounded in a court's power to control its own docket and proceedings." *Sec. & Exch. Comm'n v. Winburn*, No. 94-cv-00342, 1999 WL 151413, at *1 (D.C. Cir. Feb. 3, 1999) (citing *Daccarett-Ghia v. Internal Revenue Serv.*, 70 F.3d 621, 627 (D.C. Cir. 1995)). Courts "have authority to dismiss . . . if the party seeking relief is a fugitive" for several reasons. *Degen*, 517 U.S. at 824. "First, so long as the party cannot be found, the judgment on review may be impossible to enforce." *Id.* "Second, we have said an appellant's escape 'disentitles' him 'to call upon the resources of the Court for determination of his claims.'" *Id.* (quoting *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam)). Further, it "'discourages the felony of escape and encourages voluntary surrenders,' and 'promotes the efficient, dignified operation' of the courts." *Id.* (quoting *Estelle v. Dorrough*, 420 U.S. 534, 537 (1975) (per curiam)).

      The Ninth Circuit recently applied the doctrine to a defendant who fled the country while awaiting sentencing but was recaptured after sentencing had concluded. *United States v. Terabelian*, 105 F.4th 1207, 1213 (9th Cir. 2024). The court held that "although any concerns regarding the enforceability of the district court's judgment are obviated because of [the defendant's] recapture, the

---

[5] Defendant proposes—with no authority—that the Court must engage in a two-step analysis from *United States v. Cornelson*, 595 F. Supp. 3d 265, 270 (S.D.N.Y. 2022). *See* Mot. Dismiss Sup. Indict. at 8. This Court is unpersuaded. And even if this test applied, the government's analysis of the four factors is persuasive. *See* Govt's Reply Supp. Notice 4, n.2, ECF No. 11.

[doctrine's] justifications of deterrence, dignity of the courts, and efficiency all support dismissal" of his criminal appeal. *See id.* at 1219. Here, Osipov has not been captured, let alone recaptured. The same policy considerations all support rejecting his motions.

Alternatively, in *Ortega-Rodriguez*, the Supreme Court held that the fugitive disentitlement doctrine "did not justify dismissal of an appeal by a fugitive recaptured before the appeal was filed." *Degan*, 517 U.S. at 824–25 (summarizing *Ortega–Rodriguez v. United States*, 507 U.S. at 244–246). The Court noted that "the judgment of the Court of Appeals would be enforceable against the appellant, and that his earlier absence, when no appeal was pending, did not threaten the dignity of the court imposing the sanction." *Id.* at 824 (citing *Ortega–Rodriguez v. United States*, 507 U.S. at 244–246). The inverse is true here: there can be no conviction of a criminal defendant *in absentia*. Thus, Osipov's "absence . . . d[oes] threaten the dignity of the court imposing the sanction." *Id.*

Subsequently in *Degen*, the Supreme Court considered the "risk . . . of delay or frustration in determining the merits of the Government's [civil] forfeiture claims or in enforcing the resulting judgment" and the "danger the court [] will waste its time rendering a judgment unenforceable in practice." *Id.* at 825. Because these dangers were not present, the Court declined to apply the doctrine in the civil forfeiture context.[6] *See id.* Indeed, the Court concluded Degen would ultimately have to "refute the [probable cause] showing or suffer [the] loss [of his property]." *Id.*

"This case is not like *Ortega-Rodriguez* or *Degen*. Here an alternative mechanism is not available to address the concerns raised by the government. Most notably, [Osipov] has not proposed a means of ensuring that we will be able to enforce our decision should we" deny his motion to dismiss. *Martin v. Mukasey*, 517 F.3d 1201, 1206 (10th Cir. 2008). Osipov has admitted that a ruling on the merits would "merely maintain the status quo[,]" i.e., Osipov's indefinite residence in Switzerland.

---

[6] Congress enacted 28 U.S.C. § 2466 in response to *Degen*. *See $6,976,934.65*, 554 F.3d at 127.

Mot. Dismiss Sup. Indict. at 16. This leaves the Court to render an unenforceable, "heads you win, tails you'll never find me" judgment. *Antonio-Martinez v. Immigr. & Naturalization Serv.*, 317 F.3d 1089, 1093 (9th Cir. 2003). And "enforceability of our decisions" is of "[f]irst and foremost [] concern." *Mukasey*, 517 F.3d at 1204. "We are accordingly reluctant to decide what may prove to be a moot case." *Id.* at 1205 (quoting *Lopez v. Malley*, 552 F.2d 682, 683 (10th Cir. 1977)).

The *Degen* court considered two other purposes when applying the doctrine: "[t]he need to redress the indignity visited upon the District Court by [a defendant's] absence from the criminal proceeding, and the need to deter flight from criminal prosecution[.]" *Degen*, 517 U.S. at 828. Although the Court found disentitlement in *Degen* to be "too blunt an instrument for advancing" these purposes, *id.* at 828, the circumstances are different here. Unlike in *Degen*, a decision here in favor of the government "would be virtually superfluous." *Mukasey*, 517 F.3d at 1205. "This worthless judgment, in turn, would be an encouragement to like-minded litigants." *Id.* This court has a high a volume of foreign national defendants, often charged with serious offense such as terrorism, proliferation of nuclear weapons, and election interference. *See, e.g.*, Crim. Compl. 2, *United States v. Lyles*, No. 21-cr-010, (D.D.C. Dec. 15, 2020), ECF No. 1; Indictment 1, *United States v. Man et al.*, No. 20-cr-032 (D.D.C. Feb. 5, 2020), ECF No. 1; Indictment 1, *United States v. Jalili et al.*, No. 24-cr-439 (D.D.C. Sept. 26, 2024), ECF No. 1. Thus, it behooves this court to discourage flight and encourage appearance. And "the spectacle of a criminal defendant reposing in Switzerland, beyond the reach of our criminal courts, while at the same time mailing papers to the court . . . and expecting them to be honored" is an indignity upon this Court that encourages copycat bad behavior. *Degen*, 517 U.S. at 828.

### III.    CONCLUSION

The Court recommends DENYING Defendant's motion without prejudice.[7] Osipov has two choices: he can either appear and raise any legitimate defense or he can choose not to appear and face any attendant risks. "If [Osipov] needs the district court to decide his motion, this international businessman holds the key to unlock his dilemma: travel to [Washington, D.C.] and answer the charges or at least commit to accept the consequences, good or bad, of the ruling. That is all the district court ask[s] of him." *Martirossian*, 917 F.3d at 887–88.

Date: October 1, 2024

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

---

[7] Pursuant to Local Criminal Rule 59.2, any party who objects to the Report and Recommendation must file a written objection with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. The objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objection. Failure to file timely objections may waive the right to appeal from an order of the District Judge that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).